# COMPOSITE EXHIBIT A

**FORM 1.997.    CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing
and service of pleadings or other documents as required by law. This form must be filed by the
plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant
to section 25.075, Florida Statutes. (See instructions for completion.)

        **I.    CASE STYLE**

            IN THE CIRCUIT/COUNTY COURT OF THE <u>FIFTEENTH</u>   JUDICIAL CIRCUIT,
                    IN AND FOR <u>PALM BEACH</u>   COUNTY, FLORIDA

Donald J Trump
Plaintiff                                            Case # _____
                                                     Judge  _____

vs.
Letitia James
 Defendant

_____

        **II.    AMOUNT OF CLAIM**
Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of
the claim is requested for data collection and clerical processing purposes only. The amount of the claim
shall not be used for any other purpose.

☐  $8,000 or less
☐  $8,001 - $30,000
☐  $30,001- $50,000
☐  $50,001- $75,000
☐  $75,001 - $100,000
☐  over $100,000.00

        **III.    TYPE OF CASE**      (If the case fits more than one type of case,   select the most
definitive category.) If the most descriptive label is a subcategory (is indented under a broader
category), place an x on both the main category and subcategory lines.

- 1 -

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
   ☐ Business governance
   ☐ Business torts
   ☐ Environmental/Toxic tort
   ☐ Third party indemnification
   ☐ Construction defect
   ☐ Mass tort
   ☐ Negligent security
   ☐ Nursing home negligence
   ☐ Premises liability—commercial
   ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
   ☐ Commercial foreclosure
   ☐ Homestead residential foreclosure
   ☐ Non-homestead residential foreclosure
   ☐ Other real property actions

☐Professional malpractice
   ☐ Malpractice—business
   ☐ Malpractice—medical
   ☐ Malpractice—other professional
☒ Other
   ☐ Antitrust/Trade regulation
   ☐ Business transactions
   ☐ Constitutional challenge—statute or ordinance
   ☐ Constitutional challenge—proposed amendment
   ☐ Corporate trusts
   ☐ Discrimination—employment or other
   ☐ Insurance claims
   ☐ Intellectual property
   ☐ Libel/Slander
   ☐ Shareholder derivative action
   ☐ Securities litigation
   ☐ Trade secrets
   ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

- 2 -

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

### COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.**    **REMEDIES SOUGHT** (check all that apply):
☐ Monetary;
☒ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.**    **NUMBER OF CAUSES OF ACTION:** [   ]
(Specify)

  2

**VI.**    **IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.**    **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.**    **IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☐ yes
    ☒ no

**IX.**    **DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
    ☐ yes
    ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Timothy W. Weber          Fla. Bar # 86789
        Attorney or party                     (Bar # if attorney)

Timothy W. Weber               11/02/2022
  (type or print name)             Date

NOT A CERTIFIED COPY

- 3 -

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

PRESIDENT DONALD J. TRUMP,

Plaintiff,

CIVIL DIVISION
v.                                                                Case No.: _____

LETITIA JAMES, individually and in
Her official capacity as Attorney
General of The State of New York,

Defendant.

_____/

## SUMMONS

THE STATE OF FLORIDA
TO:   Each Sheriff of the State:

YOU ARE COMMANDED to serve this Summons and Complaint upon:

**LETITIA JAMES, individually**
**Empire State Plaza**
**Justice Building, 2nd Floor, Albany, NY 12224**

Each Defendant is required to serve written defenses to the Complaint on Timothy W.
Weber, Esq. and Jeremy D. Bailie, Esq. of Weber, Crabb & Wein, P.A., Plaintiff's attorney,
whose address is 5453 Central Avenue, St. Petersburg, Florida 33710, within twenty (20)
days after service of this summons on that Defendant, exclusive of the day of service, and to
file the original of the defenses with the Clerk of this Court either before service on Plaintiff's
attorney or immediately thereafter. If the Defendant fails to do so, a default will be entered
against that Defendant for the relief demanded in the Complaint.

WITNESS my hand and the seal of this Court on ___Nov 03 2022___.



JOSEPH ABRUZZO
Clerk of the Circuit Court and Comptroller
P. O. Box 4667, West Palm Beach, FL 33402

(SEAL)

By:___Blake Smith___

Deputy Clerk     BLAKE SMITH

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

**"If you are a <u>person with a disability</u> who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings Jr., MPA, PHR, the Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificación, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefónica no lo protegerá. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podría ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guía telefónica. Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera

usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

**Si usted es una persona minusválida que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con [identify applicable court personnel by name, address, and telephone number], por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711.**

## IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

**Si vous êtes une personne handicapée qui a besoin de mesures d'adaptation pour participer à cette 3revue3re, vous avez droit, sans frais pour vous, à une certaine assistance. Veuillez contacter [identify applicable court personnel by name, address, and telephone number]au moins 7 jours avant votre comparution 3revue au tribunal, ou immédiatement après avoir reçu cette notification si le délai avant la comparution 3revue est inférieur à 7 jours; si vous êtes malentendant ou avez un trouble de la parole, appelez le 711.**

## ENPÒTAN

Pwosedi legal yo te pran kont ou. Ou gen 20 jou konsekitif ki soti nan dat konklizyon sa a pou ou ranpli yon repons alekri pou plent sa a nan tribinal sa a. Yon apel telefon ki senp se pa ase pou pwoteje ou. Ou oblije ranpli repons alekri ou a, ak nimewo a dosye pi wo a ak non pati yo ki te nonmen isit la, si ou vle tribinal la tande ka w la. Si ou pa ranpli repons alekri ou nan rele egzije a, ou riske pedi koz la ak sale ou, lajan ou, ak pwopriyete ou yo ka mete men sou pita, san okenn lot avi nan tribinal la. Gen lot obligasyon legal epi ou ka mande sevis imedya yon avoka. Si ou pa konnen yon avoka, ou ka rele yon sèvis referans avoka oswa yon biwo ed legal (ki nan lis nan anye telefon). Si ou chwazi pou ou soumet yon repons alekri tet ou, ou pral bezwen tou voye oswa voye yon kopi repons ekri ou nan fòm sa a an menm tan an tankou fomalite sa a "Avoka Pleyan/ Pwokire a" (Pleyan oswa avoka li) non anba a.

**Si ou se yon moun ki enfim ki bezwen akomodasyon pou w kab patisipe nan pwosedi sa a, ou gen dwa, san ou pa bezwen peye okenn lajan, pou w jwenn yon sèten èd. Tanpri kontakte [identify applicable court personnel by name], Kòdonatris pwogram Lwa Ameriken pou Moun ki Enfim yo nan [identify court personnel's address and telephone number], fè sa omwen 7 jou anvan dat ou gen randevou pou parèt nan Tribinal la, oswa fè sa imedyatman apre ou fin resevwa konvokasyon an si dat ou gen pou w parèt nan tribinal la mwens pase 7 jou; si ou gen pwoblèm pou w tande byen oswa pou w pale klè, rele 711.**

Counsel for Plaintiff
Timothy W. Weber, Esq.
Jeremy D. Bailie, Esq.
Weber, Crabb & Wein, P.A.
5453 Central Avenue
St. Petersburg, Florida 33710

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

IN RE: STANDING ORDER FOR
CASE MANAGEMENT FOR SUBMISSION
OF AGREED CASE MANAGEMENT PLAN FOR
CASES FILED ON OR AFTER APRIL 30, 2021

_____ /

**STANDING ORDER FOR CASE MANAGEMENT AND SUBMISSION OF AGREED
CASE MANAGEMENT PLAN IN CIVIL CASES
IN THE FIFTEENTH JUDICIAL CIRCUIT FILED ON OR AFTER APRIL 30, 2021
(DCMSO)**

Pursuant to Florida Rule of Civil Procedure 1.200(a), Florida Rule of General Practice and
Judicial Administration 2.545, and Administrative Order 3.107 entered by the Chief Judge of this
Circuit, the parties are informed of the following information and procedures applicable to civil
lawsuits filed in the Circuit Court on or after April 30, 2021:

1. **SERVICE OF THIS ORDER.** The Plaintiff is directed to serve a copy of this Order
with each Summons issued in this case. One copy of this Order is to be filed with the Clerk of the
Circuit Court with proof of service.

2. **CIVIL CASE MANAGEMENT SYSTEM.** The Supreme Court of Florida has
established guidelines for the prompt processing and resolution of civil cases. This Court has
adopted a case management system to help meet those guidelines. In contested cases, the parties
are required to participate in the case management system. The case management system requires
early consultation and cooperation among the parties for the preparation and submission of an
Agreed Case Management Plan and early involvement by the Court. The Agreed Case
Management Plan requires the parties to identify a case track, confer in good faith and attempt to
narrow the matters in controversy, identify the issues that require direct involvement by the Court,
and establish a schedule for addressing those issues.[1] The Agreed Case Management Plan may be
accessed at the Court's website at: https://15thcircuit.com/civil-differentiated-forms-and-orders.

Unless all of the Defendants have been served and have been defaulted or dropped, an Agreed
Case Management Plan must be submitted to the assigned divisional queue via the Court's online
scheduling system (OLS) as an attachment, in PDF format, to a proposed Order Accepting Agreed
Case Management Plan on or before 130 days from the date of filing of the initial complaint. If
the parties are unable to agree on an Agreed Case Management Plan by the applicable deadline, a

_____

[1] Case Track options include Expedited, Streamlined, General, or Complex. Case Tracks have been
established in order to comply with the case disposition standards set forth in Florida Rule of General
Practice and Judicial Administration 2.250(a)(1)(B).

case management conference will be scheduled by the Court or the Court will review and issue an Order Implementing Case Management Plan without agreement of the Parties. No matters that arise as a result of this standing order, including lack of agreement, will be set on the Court's Uniform Motion Calendar and will, instead, be settled by the Court either at the case management conference or via an Order Implementing Case Management Plan without agreement of the parties. If a case management conference is scheduled, attendance by trial counsel and those parties who are not represented by counsel is mandatory.

If all Defendants are served and defaulted or dropped, the Plaintiff will file the appropriate documentation to pursue a Default Final Judgment within 130 days of the filing of the complaint and Final Judgment is to be entered or set for hearing within 150 days of the filing of the complaint.

3. **MEDIATION/ALTERNATIVE DISPUTE RESOLUTION (ADR)**. ADR provides parties with an out-of-court alternative to settling disagreements. Mediation is a type of ADR wherein an independent third party attempts to arrange a settlement at a conference between the parties. The Court requires the parties to participate in Mediation prior to trial unless the parties agree to another form of ADR.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, on this 26 day of April, 2021.

_____
**Administrative Circuit Judge**

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA
CIVIL DIVISION

PRESIDENT DONALD J. TRUMP,

     Plaintiff,

v.                                        Case No.: _____

LETITIA JAMES, individually and in
her official capacity as Attorney
General of The State of New York,

     Defendant.

_____/

## **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff, PRESIDENT DONALD J. TRUMP ("President Trump"), by and through his undersigned counsel, sues Defendant, LETITIA JAMES ("James" or "Defendant"), individually and in her official capacity as Attorney General of the State of New York, and alleges:

## **PRELIMINARY STATEMENT**

1.    Extraordinary wrongdoing requires extraordinary relief. As set forth below, James has repeatedly abused her position as Attorney General for the State of New York to pursue a relentless, pernicious, public, and unapologetic crusade against President Trump, a resident of Palm Beach County, Florida, with the stated goal of destroying him personally, financially, and politically. Suffice it to say that these actions are contrary to both the laws of New York and Florida.

2.      James' war of intimidation and harassment on President Trump, his family, his business interests, and his associates is longstanding and continuing. James campaigned for Attorney General on the promise of launching investigations of President Trump before even the pretext of a predicate existed. Since her election, she made good on those campaign promises and established within her office a policy of intimidating and harassing President Trump whenever possible. These crusades began shortly after President Trump became President of the United States and have continued since he returned to his residence in Palm Beach County, Florida.

3.      In September 2022, as the midterm elections approached and James herself faced reelection against a Republican challenger, James began amping up her attacks on President Trump to rev up her political base. James initiated an abusive civil enforcement action in the state court in New York (the "Civil Action") claiming that President Trump and others committed fraud on sophisticated commercial lenders and insurance companies (represented by some of the largest, finest, and toughest law firms in the world) by submitting statements of President Trump's net worth which, on their face, contained numerous disclaimers regarding the manner in which the estimates were prepared. To place this abusive claim in context, the many assets owned by President Trump carry very little debt and most are free and clear.

4.      Though James' vehicle is unimpressive her ultimate destination is staggering. Using the Civil Action, James seeks unprecedented oversight of President

Trump's business and financial affairs — including control over President Trump's Florida revocable trust[1] — as she grandstands in demanding $250 million in "restitution" for the people of New York.

5.      In truth, James knows that no restitution is owed but seeks only attention for herself and retribution against President Trump.

6.      As outlined below, James's longstanding and continued bias against President Trump and the Trump Organization is immediately and objectively apparent, demonstrated by her own oft-repeated statements.

7.      James began making threats against President Trump before she was even elected, at a time when she possessed no actual information or insight into President Trump's business. She campaigned for her position on the promise to weaponize her resources against President Trump and "anyone in [his] orbit." During her unsuccessful bid for governor of New York, she boasted about suing him "76 times." Now up for reelection as Attorney General, she is campaigning once again on the promise that if reelected she will continue her vitriolic and obsessive pursuit of President Trump. None of these actions are proper actions for a state Attorney General.

---

[1] The Trust itself was incorrectly named as a defendant in the Civil Action and has not been properly served with process in New York.  James failed to sue the trustee in his capacity as such and merely named the trust itself as a defendant.  A Florida revocable trust is not a separate legal entity with capacity to sue or be sued.

8.      But what began as a cartoonish, thinly-veiled effort to publicly malign President Trump for personal political gain has morphed into a plot to obtain control of a global private enterprise ultimately owned by a Florida revocable trust in which President Trump is the settlor.

9.      Defendant, an individual guided solely by political animus and a desire to harass, intimidate, and retaliate against President Trump has been permitted to hand-pick the New York state court judge to rule on her request to seize control of the Trump business empire, comprised of highly valued real estate and other assets, minimal debt, and brand value which, if properly managed and run, is virtually incalculable. This is supposedly because, as the Attorney General claims, that sophisticated lenders and insurance companies received inflated estimates of President Trump's net worth, despite that over the last ten years in question not one bank missed an interest payment, cash payment, redemption, or principal payment of any kind and, during the same period, not one notice of default was ever sent for payments due. Likewise, insurance companies were paid in full, on time, and on schedule and made no complaints to the Attorney General about President Trump or any of his companies before James ginned up this investigation.

10.     James purportedly brought the suit to protect these sophisticated banks and insurance companies (again represented by the largest, toughest, and finest law firms in the United States and beyond) only to find, late in the process, however,

after reviewing more than 10 million pages of documents, that the Trump Organization was highly underleveraged with very low debt, owned some of the finest assets in the world, and that all loans were current without defaults or delinquencies of any kind. This was a disaster for the out-of-control James but she decided out of hatred and scorn of President Trump, and for the simple reason of using the publicity, to proceed anyway.

11.     As a private company, nobody knew very much about the great business that then–businessman Donald Trump had built but now it is being revealed by James and much to her chagrin. The continuing witch hunt that has haunted and targeted Donald Trump since he came down the "golden escalator" at Trump Tower in June of 2015 continues. President Trump built a great and prosperous company but a company nevertheless that must be carefully, delicately, yet powerfully managed, and the appointment of a political monitor or the interference by a political hack like James who is using this lawsuit for political gain, would bring great harm to the company, the brand, the employees and its overall reputation. Likewise, it could virtually destroy the highly profitable Florida properties, which include the legendary Trump National Doral Golf Club and Resort (one of the most successful in the world), Trump International Golf Club in Palm Beach, Florida, Trump Jupiter Country Club in Jupiter, FL, and, of course, one of the greatest and most successful clubs in the world, The Mar-a-Lago Club. In addition to greatly affecting the real

estate values of these properties, a monitor or supervisor representing a failed and poorly rated Attorney General's office from distant New York, would jeopardize the more than 1,000 employees that operate these properties and would totally destroy the "pipeline" of future projects not only in the great State of Florida, but throughout the United States, and indeed the world.

12.    In furtherance of her attempts to steal, destroy or control all things Trump, James has become preoccupied with obtaining a copy of President Trump's revocable trust, the Donald J. Trump Revocable Trust (the "Trust"), a revocable trust governed by Florida law and sited in Florida. The Trust contains his private estate plan and present decisions regarding the disposition of his assets upon death.  These are private matters to President Trump, and under Florida law, revelation of a settlor's revocable trust while the settlor is still alive threatens the settlor's right to privacy guaranteed by Article I, Section 23 of the Florida Constitution and the common law.

13.    In addition, James seeks to interfere with President Trump's unfettered right to own, acquire, transfer, or dispose of property, personally or in the Trust, contrary to Article I, Section 2 of the Florida Constitution.

14.    Additionally, Defendant's actions seek to infringe on his trustee's powers over the Trust and impose substantial interference with the ability of the

trustee to discharge the trustee's duties in accordance with § 736.0815, Fla. Stat., § 736.0816 Fla. Stat., and the Trust.

15.   President Trump's request is not light: he seeks declaratory and injunctive relief against an out-of-state Attorney General who has malevolently targeted him because he ran for and was elected the 45th President of the United States and, perhaps more importantly, is leading in all polls by substantial margins both in the Republican Party for the nomination and against any and all Democrats for the presidency itself.

16.   President Trump comes before this Court for protection from James' ongoing abuse and efforts to interfere with, control, gain access to, and publicly expose the terms of his Florida revocable trust.

## **JURISDICTION, PARTIES AND VENUE**

17.   This is an action for declaratory and injunctive relief.

18.   The Donald J. Trump Revocable Trust (the "Trust") is a Florida revocable trust established and governed by the laws of the State of Florida. Its principal place of administration is in Florida.

19.   Pursuant to Florida Statutes, this Court may act to protect and carry out the administration of a trust to the extent the Court's jurisdiction is invoked by an interested person or as provided by law. *See* § 736.0201(2), Fla. Stat.

20.     Moreover, circuit courts have original jurisdiction over all equitable claims pursuant to § 26.012(2)(c), Fla. Stat.

21.     President Donald J. Trump is the settlor and a beneficiary of the Trust and resides in Palm Beach County, Florida.

22.     Venue for actions and proceedings concerning trusts, including those seeking a declaration of rights or other matters concerning trustees and beneficiaries under § 736.0201, may be laid in any county where the beneficiary suing or being sued resides. *See* § 736.0204, Fla. Stat.

23.     This Court has personal jurisdiction over Defendant James based on her unlawful attempts to reach into Florida and exercise powers delegated to the Trustee, as § 736.0202, Fla. Stat. provides, in relevant part:

> (a) Any trustee, trust beneficiary, **or other person**, **whether or not a citizen or resident of this state, who personally or through an agent** does any of the following acts related to a trust, **submits to the jurisdiction of the courts of this state involving that trust:**
> …
> (4)  Accepts or **exercises a delegation of powers or duties from the trustee** of a trust having its principal place of administration in this state.

(emphasis supplied). *See Electro Eng'g Prods. Co. v. Lewis,* 352 So.2d 862, 864 (Fla.1977) (a plaintiff seeking to obtain jurisdiction over a nonresident defendant initially needs only to allege sufficient facts to make out a prima facie case of jurisdiction).

24.     Alternatively, this Court has personal jurisdiction over James based on the tortious acts she committed within this state and the scope of authority she seeks to exert over real property and other Trust assets satisfy the minimum contacts requirements of due process. *See* § 48.193(1)(a)(2), Fla. Stat.; *Venetian Salami Co. v. Parthenais*, 554 So.2d 499 (Fla. 1989) (establishing a two-step inquiry for determining whether long-arm jurisdiction over a non-resident in a given case is proper).

25.     Unless judicial relief is provided as described herein, President Trump will be irreparably deprived of privacy and property rights by James.

26.     All conditions precedent to the maintenance of the causes of action alleged herein, if any, have occurred or been performed, excused, or waived.

## BACKGROUND

### I.     Defendant's Longstanding Animosity Toward President Trump

27.     Defendant is an outspoken political activist and member of the Democratic Party.

28.     Prior to serving as Attorney General of the State of New York, Defendant served as a Democratic member of the New York City Council and New York City Public Advocate for over a decade.

29.     After President Trump's victory in the 2016 Presidential Election, Defendant began displaying severe animosity towards the president-elect.

30.     Prior to President Trump's inauguration, Defendant retweeted calls for sit-ins to protest President Trump's nomination of Jeff Sessions to be United States Attorney General.

31.     Five days after President Trump's inauguration, Defendant joined public protests and declared that his "administration ha[d] shown its true and ugly colors, but we will not be silent."

32.     Over the next several months, Defendant continued to publicly voice her disdain for President Trump and his administration.[2]

33.     Six and a half months into President Trump's term, Defendant was already leading "die-in" protests against President Trump because, according to her, "we are all being killed by this administration."[3] Defendant punctuated her tweet with the hashtag, "Resist."

34.     The hashtag "#Resist" is recognized as shorthand for fighting President Trump at every level in an effort to make President Trump and his supporters

---

[2] *See, e.g.*, *id.*, (Feb. 11, 2017, 12:01 PM ET) https://bit.ly/3liyZpK ("@villagedemocrat out in full force today calling on our elected officials to fight for us against this administration."); *id.*, (Mar. 5, 2017, 5:01 PM ET) https://bit.ly/2Gl6c56 ("Hey @realDonaldTrump, we're in Queens, your hometown, rising up against your xenophobic policies, & we're ready to act."); *id.*, (June 3, 2017, 10:18 AM ET) https://bit.ly/33z0XYj ("Always proud to be with strong New York women standing up & speaking out against an administration that doesn't represent out values.").

[3] *id.* (Aug. 14, 2017, 5:55 PM ET) https://bit.ly/3lu9fqz .

"uncomfortable and not able to rest well" and thus unable to effectively implement his policies.[4]

35.     Defendant's embrace of the "resistance" mentality from the earliest days of the Trump presidency foreshadowed her relentless abuse of power as Attorney General.

36.     Roughly ten months into President Trump's term, Defendant announced: "I've been leading the resistance against Donald Trump in NYC and will only continue to do so in every way possible."[5]

37.     In her capacity as New York City Public Advocate, Defendant demonstrated a willingness to wield the government's power against those whose political beliefs differed from her own.[6] That willingness took center stage in Defendant's political campaign for attorney general and her subsequent actions as New York's chief law enforcement officer.

## II.     Defendant Campaigned for Attorney General on a Promise to Target President Trump and the Trump Organization

38.     In May of 2018, Defendant declared her candidacy for Attorney General of the State of New York.

---

[4] *'Resist' is a Battlecry, But What Does It Mean?* The New York Times, Feb. 14, 2017, https://nyti.ms/2GLln77 .

[5] *Id.*, (Oct. 16, 2017, 7:57 PM ET) https://bit.ly/3d4wBQr emphasis added).do so in every way possible." Id., (Oct. 16, 2017, 7:57 PM ET) https://bit.ly/3d4wBQr (emphasis added).

[6] *See id.*, (July 19, 2017, 10:32 AM ET) https://bit.ly/2F3wHLt ("We will not allow companies that build Trump's wall, a monument to racism and bigotry, to also do business with NYC.")

11

39.     As a candidate for Attorney General, Defendant made "taking on Donald Trump"[7] the focal point of her campaign, often comparing herself to Special Prosecutor Robert Mueller, who, at the time, was leading the investigation into the now-debunked allegations that the Trump campaign colluded with Russians to interfere in the 2016 presidential election.

40.     Defendant's campaign website not only repeated derogatory and inaccurate statements concerning President Trump's policies but also stated—with no evidentiary basis whatsoever— that President Trump had engaged in "public corruption."[8]

41.     Though it appears to have since been removed, the website at one time provided a link to a detailed outline of Defendant's strategy for rooting out corruption, with a section specifically devoted to President Trump, his family, and the Trump Organization entitled "*Investigate Trump's New York Business*."

42.     As stated in the outline, the investigation would include:

> "a review of Trump-related real estate transactions, especially those in which the Trump family suddenly started paying cash for properties after years of operating their businesses exclusively by borrowing money."

---

[7]  See, e.g., Letitia James (@TishJames), Twitter (June 27, 2018, 10:48 AM ET) https://bit.ly/2GG4uuy  ("Congrats [now-Congresswoman Alexandria Ocasio Cortez] on your victory. Looking forward to working with you to help Democrats take on Donald Trump.")
[8] http://www.tishjames2018.com/corruption/

43.     Of course, Defendant had no personal knowledge about any "Trump-related real estate transactions" at the time that she made these statements, as she had not yet been elected Attorney General and possessed no information or insight into President Trump's business other than what she had presumably seen in the media.

44.     Nonetheless, Defendant continued to shamelessly campaign on her unfounded allegations against President Trump and his family in a misguided effort to garner media attention and promote her fundraising efforts

45.     On June 26, 2018, Defendant spoke at a protest opposing the Supreme Court's decision in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), telling the crowd that "it's critically important that we all understand that this was a result of the fact that [Republicans] stole the Supreme Court seat.  An illegitimate president and an illegitimate member of the Supreme Court."[9]

46.     On July 1, 2018, Defendant tweeted "New Yorkers need a fighter who will take on Donald Trump … I'll be that fighter.  Join my campaign."[10]

47.     On July 19, 2018, in the midst of a politically-charged speech before The Bronx Democratic Party, Defendant promised to use the law as a "sword" to relentlessly bombard President Trump, proclaiming that "no one is above the law,

---

[9] *Letitia James Foley Sq Opposing Travel Ban Supreme Court Decision*, YouTube, 0:55 (June 26, 2018) https://bit.ly/3d58PDS.
[10] Letitia James (@TishJames), Twitter (July 1, 2018, 2:56 PM ET) https://bit.ly/3nh8rH4

including this illegitimate president…and so *I look forward to going into the office of Attorney General every day, suing him, defending your rights, and then going home*!"[11]

48.     In what can only be construed as an attempt to threaten and intimidate President Trump, Defendant then tweeted that President Trump is "running out of time" and warned him that she would immediately investigate him and his "cronies" when she took office.

49.     Defendant issued a similar threat on August 22, 2018, when she said, among other things, that President Trump "should be scared" about her upcoming term.

50.     On September 10, 2018, Defendant vowed to "stand up" to Trump, and later that evening, Defendant declared once more that she was "just getting started" in "tak[ing] on" President Trump.

51.     Of course, even when addressing Trump's role as the sitting President of the United States, James was driven by deep animosity for him personally and an obsessive denial that he had the right to hold public office.  In a troubling September 12, 2018 video, released during the Democratic primary, Defendant pledged that she would "never be afraid to challenge this illegitimate president."

---

[11]     Letitia    James,    Facebook,    1:18    (July    19,    2018)    (emphasis    added),
https://m.facebook.com/LetitiaJamesforNY/videos/
203059860348974.

52.     In the very same video, Defendant baselessly accused Trump of a slew of crimes, including obstruction of justice and laundering money from foreign governments, and demanded that he be indicted. Defendant promised to "join with law enforcement and other attorney generals across this nation *in removing this President from office*." Mirroring her previous allegations, Defendant's call for Trump to be investigated was devoid of both fact and merit. Nevertheless, Defendant concluded the video by promising that "the days of Donald Trump are coming to an end."

53.     On the same day, Defendant took to Twitter to double down, reiterating her warrantless claim that Trump is an "illegitimate president" and promising once more to "fight back" against Trump if New Yorkers voted for her.

## III.   As Attorney General, Defendant Immediately Implemented her Premeditated, Ongoing Plan of Intimidation and Harassment of President Trump

54.     On November 6, 2018, Defendant was elected, as a Democrat, the Attorney General of the State of New York and immediately began implementing her plan to weaponize her office to attack President Trump in a manner exceeding conventional political opposition. During her victory speech, she made a solemn promise to "shin[e] a bright light into every dark corner of [Trump's] real estate holdings," making no distinction between holdings located in New York and those located elsewhere, including Florida.

55.     Emboldened by her election, Defendant began to shamelessly display the bias against President Trump that she demonstrated before gaining office, publicly guaranteeing the outcome of any future investigation or claim against President Trump. These guarantees were made before she had ever established even a pretext of legal predicate for an investigation, claim, or action, and before gathering any facts or requesting documents from President Trump in connection with an investigation, claim, or action.

56.     For starters, in an interview with political activist and former Democratic candidate for New York City Council Adina Sash, Defendant was asked if she planned to "sue [President Trump and the Trump Organization]."  Defendant laughingly responded "[o]h, we're definitely going to sue him.  We're going to be a real pain in the ass.   He's going to know my name personally."

57.     Then, on December 12, 2018, during an NBC News interview given eighteen days before assuming office, Defendant vowed to "use every area of the law to investigate President Trump and his businesses transactions and that of his family as well." Notably, Defendant did not curtail her persecution of Trump and his family, instead promising to also investigate "anyone in [President Trump's] orbit."

58.     Defendant repeatedly, publicly, and proudly stated during her campaign and transition period that she intended to weaponize her office to target and

intimidate President Trump upon taking office. This ensured her policy of intimidation would be in place on day one.

59.     In fact, Defendant's open threats and promises to investigate and sue President Trump were so appalling that even members of her party condemned them as unlawful.

60.     For example, Daniel Goldman, the Democratic Party's counsel for the impeachment process against President Trump and a former Assistant United States Attorney in Manhattan, warned that Defendant's statements "give the appearance of an individualized political vendetta . . . It's essential that prosecutors maintain their neutrality and an objective view of the fact evidence, no matter the politics involved."  By abandoning even the pretext of such neutrality, Goldman stated Defendant "[went] too far in allowing politics to shape her agenda."

61.     In sum, before assuming office, Defendant promised to investigate President Trump dozens of times over many months, before obtaining *any* information specific to her eventual public office that could supply an authentic predicate to an unbiased investigation or action against President Trump. Her campaign promises and transition plans to investigate President Trump's business activities and associates was based on information no greater than that available to any other citizen and establish that the Defendant brought a premeditated policy of intimidation and harassment to her role as Attorney General.

62.     Defendant was sworn in as Attorney General of New York on January 1, 2019.   In so doing, Defendant swore to support the Constitution of the United States and faithfully discharge the duties of Attorney General.  Unfortunately, she must have had her fingers crossed behind her back when she did so.

63.     Upon assuming her role, Defendant immediately got to work making good on her campaign promises and established her premeditated policy of intimidation and harassment of President Trump as the policy of her office.

64.     From that point forward, Defendant's actions assumed the supposed color of law and occurred in her official capacity, although irredeemably tainted by Defendant's policy of intimidation and harassment.

## IV.    Defendant's Policy of Intimidation and Harassment Leads to the Special Proceeding

65.     On January 3, 2019, three days after she was sworn in as Attorney General, Defendant told CNN that she would "ensure that the man currently occupying the Oval Office is held accountable to [sic] any and everything he has done."

66.     Defendant further stated that she would "never be afraid to challenge this illegitimate president" and that investigating Trump "fuels [her] soul."

67.     On March 11, 2019, Defendant employed the authority and vast array of resources of the Office of the Attorney General to formally open an investigation of the Trump Organization and issued subpoenas to Deutsche Bank and Investors

Bank "for records relating to the financing of four major Trump Organization projects."

68.    The subpoenas were "a culmination of months of threats from [Defendant] that she would aggressively investigate Mr. Trump."

69.    Defendant has claimed that she relied upon February 19, 2019 testimony given by Michael Cohen ("Cohen"), a discredited, disgraced, and disgruntled former attorney who evaded taxes on income from his taxicab medallions, made false statements to financial institutions for personal gain, and lied to Congress, as grounds for initiating the investigation of President Trump.

70.    Defendant's claim of reliance on Cohen's testimony is pretext, not predicate. Defendant had established her personal bias against President Trump and intent to initiate investigations in search of a crime years before Cohen testified before Congress.

71.    Moreover, Defendant had more than six weeks in office to establish an official policy of intimidating and harassing President Trump before Cohen's testimony.

72.    Thereafter, Defendant openly flouted her duty to remain neutral in public commentary pertaining to an ongoing investigation. Defendant continued to disparage President Trump and the Trump Organization throughout 2019, even floating outright lies.

73.     For example, on April 23, 2019, Defendant repeated her prior, unfounded allegation that President Trump and the Trump Organization were engaged in criminal activity: "We need to focus on Donald Trump and his abuses . . . we need to follow his money . . . we need to find out where he's laundered money . . . ."

74.     After more than three years of formal investigation, targeted public attacks, and millions of dollars and thousands of hours spent, it is clear that neither President Trump  nor any of President Trump's companies laundered money in any way shape or form  Defendant fabricated the allegations out of thin air, clearly indicating that even after assuming her office and initiating investigations her desire to pursue President Trump was driven by bias, political animus, and the most severe case of Trump Derangement Syndrome –not facts!

75.     With this mindset firmly established, even after the Cohen testimony, it is clear any stated predicate for initiating an investigation was merely a pretext for achieving her overall goal of intimidating and harassing President Trump and the Trump Organization to garner underserved publicity for herself as a politician and harm President Trump

76.     Defendant's conduct continued. On July 23, 2019, Defendant tweeted that Trump "has spent his career hiding behind lawsuits" and promised to "vigorously fight" him.

77.     Two and a half weeks later, Defendant served a subpoena *duces tecum* on Trump, the Trump Organization's corporate officers, his children, and third parties for information and testimony about a wide range of properties owned by Trump across the country, specifically including many in Florida.

78.     On July 24, 2020, Defendant announced her intention to sue the Trump Administration for the purported unlawful practice of excluding undocumented immigrants in the 2020 census (a case which was ultimately thrown out by the Supreme Court).  In her tweet, Defendant boasted "We beat the president before in court, and we will beat him again."

79.     On August 24, 2020, Defendant commenced a special proceeding under Article 4 of the New York Civil Practice Law and Rules, in New York Supreme Court, New York County, ostensibly to compel compliance with the subpoena's previously issued. *See People v. The Trump Organization*, No. 451685/2020 (the "Special Proceeding").

80.     Under Defendant's leadership the Office of the Attorney General has been reduced to nothing more than a weapon in James' arsenal to wage war on President Trump.  This is made abundantly clear by the fact that August 24, 2020 was also, conveniently, the first day of the Republican National Convention.  Clearly, Defendant's true goal is the ongoing intimidation and harassment of President Trump with the intent of causing him harm.

81.     Yet, despite Defendant's biased and inflammatory statements and the unlawful and unconstitutional nature and scope of the Special Proceeding, President Trump and his companies produced over 8 million pages of documents in response to Defendant's subpoenas. Still, she was not satisfied.

## V.     Defendant's Policy of Pursuing President Trump Accelerated Post-Presidency.

82.     President Trump left office on January 20, 2021, but as a private citizen he has remained in the public eye and remains considered by many to be the de facto head of the Republican Party. Since leaving office, he has publicly promoted policies and candidates he favors while opposing the disastrous policies of the Biden Administration and other Democrats, which he believes have so badly hurt our nation.

83.     Defendant, emboldened by the Democrats' apparent national victories in the November 2020 elections, hoped for a personal political lift by associating her Office's unjust pursuit of President Trump and the Trump Organization with his departure from office.

84.     Defendant declared her candidacy for Governor of New York State on October 29, 2021.

85.     In her announcement video, she boasted that she "sued the Trump Administration 76 times, but who is counting?" In making this statement, Defendant

signaled that she had planned to make "taking on Trump" the centerpiece of yet another statewide campaign.

86.    On December 9, 2021, amid poor polling numbers, Defendant suspended her campaign for Governor of New York.  The reason behind the lack of support for her gubernatorial candidacy remains unclear, but aside from her dogged pursuit of Trump Defendant's record as Attorney General has little to show.  Perhaps the public had reservations over electing as their governor a Javert-style persecutor driven by personal vendettas against political opponents.  Perhaps some voters were tired of her commitment to a political witch hunt given the statewide crime rate or considered unqualified or unlikable.

87.    In any event, at her embarrassing withdrawal from the gubernatorial race Defendant stated, "I have come to the conclusion that I must continue my work as attorney general.   There are a number of important investigations and cases that are underway, and I intend to finish the job.   I am running for reelection to complete the work New Yorkers elected me to do."

88.    By saying this, Defendant left no doubt that she remained undeterred from her relentless pursuit of her illegitimate Trump investigation and would use it in her run for reelection.

89.    Unlike the campaign promises of her first run, however, Defendant's reelection strategy would need to be fueled by action.  This required her to move

beyond the unjustified investigation that drove the Special Proceeding, and toward a civil action.

## **GENERAL ALLEGATIONS**

### VI. **Defendant Initiates an Civil Enforcement Action Against President Trump Pursuant to her Policy of Intimidation and Harassment**

90.    On September 21, 2022, Defendant commenced a civil action in the Supreme Court of the State of New York, New York County, entitled *People of the State of New York, et al. v. Donald J. Trump, et al,* Index No. 452564/2022 (the "Civil Action") by directing a subordinate, consistent with Defendant's established policy of intimidation and harassment of President Trump and "anyone in his orbit", to file a complaint in Defendant's official capacity and under color of law pursuant to the authority granted to the Office of the Attorney General of the State of New York under Executive Law § 63(12) ("E.L. 63(12)").

91.    In the Civil Action, James identifies President Trump's revocable trust as the beneficial owner of various entities that own or control assets in New York and beyond, including in Florida. This includes The Mar-a-Lago Club, Trump National Golf Club-Jupiter, the Trump National Doral Golf Club, Trump International Golf Club - West Palm, and numerous other projects currently being considered and in the pipeline in the State of Florida, further demonstrating Defendant's lack of regard for limitations on her own authority and intent to control assets outside the State of New York.

92.     Immediately upon filing the complaint, Defendant, again through a subordinate acting pursuant to the established policy of intimidation and harassment, took the extraordinary step of also filing a Request for Judicial Intervention ("RJI") with the Clerk *before* serving the complaint on President Trump (who, along with various related entities and other non-parties here, is a defendant in the Civil Action).

93.     The RJI requested that the Civil Action *not* be assigned to a justice in the Commercial Division of the Supreme Court of the State of New York, New York County (the "Commercial Division"), which is customary and standard.  Instead, the RJI requested the Civil Action be assigned to the *same justice*, Arthur F. Engoron, who presided over the Special Proceeding and made not a single ruling in favor of President Trump and referred to him as a bad guy. Suffice it to say that this justice has also demonstrated extreme bias against President Trump, fining him $10,000 per day for claimed subpoena non-compliance despite his having produced millions of pages of documents.

94.     Despite the Special Proceeding and Civil Action each being part of Defendant's wrongful witch hunt of a political opponent, there are significant differences between the two proceedings that should have resulted in the Civil Action being assigned to the Commercial Division.

95.     Indeed, civil actions brought by an Attorney General pursuant to the authority granted by E.L. 63(12) have been uniformly assigned to the Commercial

Division in the past.  Moreover, the Civil Action's $250,000,000 claim for restitution—though absurd on the merits—far exceeds the jurisdictional standards and subject-matter criteria for assignment to the Commercial Division.

96.     Defendant's judge-shopping maneuver using the RJI further demonstrates Defendant's corrupt and bad faith pursuit of the Civil Action. There is no other reason to justify *specifically seeking out* Justice Engoron, who is assigned to a noncommercial part of the New York judicial system that lacks the rules and expertise of the Commercial Division.

97.     With her desired justice at least temporarily presiding over the Enforcement Action, Defendant next directed a subordinate, consistent with her policy of intimidation and harassment of President Trump, to seek a preliminary injunction to restrain and supervise (i.e., destroy) his companies.

98.     James seeks to extend this oversight and control to President Trump's Florida revocable trust, threatening to substantially interfere with the ability of the trustee of the Trust to carry out its provisions and discharge his duties in accordance with Florida law.

99.     Similar to how Defendant timed her initiation of the Special Proceeding to maximize her own political benefit and damage President Trump, Defendant's request for preliminary judicial intervention is designed to create a media sensation

that will damage President Trump and raise her own political profile just days before the national midterm elections and her own bid for reelection

100.   The manner in which Defendant has prosecuted the Civil Action is true to form and demonstrates the continued vigor of her political and personal vendetta against President Trump.

101.   In context, Defendant's efforts to obtain control over President Trump's business organization, including the revocable Trust, is the culmination of her endless public promises to investigate President Trump without proper predicate. It follows her open and baseless disparagement of President Trump, her accusations that President Trump broke the law despite admitting she possessed no evidence to substantiate those allegations, her aggressive and wide-sweeping investigation into President Trump's business activities that led to and included the Special Proceeding, and now the biased initiation and prosecution of the Civil Action.

102.   On October 31, 2022, James filed additional documents revealing her true intentions – a bevy of correspondence revealing her zeal to obtain a copy of President Trump's Florida-based revocable trust. A copy of this correspondence is attached as **Exhibit A.**

103.   President Trump, a Florida resident with the right to revoke, amend, or modify the terms of his revocable trust at any time before it becomes irrevocable, requires protection from James' demand to invade his privacy.

104.   Absent judicial relief, including the permanent and temporary injunctive relief sought, James will continue her campaign to obtain the revocable trust instrument, interfere in the administration of the revocable trust, interfere with President Trump's right to revoke the revocable trust, and irreparably harm President Trump and assets he controls in the State of Florida which employ nearly a thousand employees in the State.

### COUNT I
### (Violation of Plaintiff President Donald J. Trump's Rights to Privacy and Property)

105.   Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1-105 above as if fully set forth herein.

106.   President Trump is a natural person residing in Florida with the right to be left alone from governmental intrusion into his private life under Article I, Section 23 of the Florida Constitution. He also enjoys substantial common law privacy protections from private actors who would tortiously invade his privacy.

107.   A right to privacy is a personal one, and intentional damage to an individual's rights to privacy is personal injury and tortious.

108.   The constitutional right of privacy ensures that individuals are able to determine for themselves when, how, and to what extent information about them is communicated to others. *Weaver v. Myers*, 229 So.3d 1118 (Fla. 2017).

109.   The right to privacy recognized by the Florida Constitution encompasses at least two different categories of interest; the first is the individual interest in avoiding disclosure of personal matters, while the second is the interest in independence in making certain kinds of important decisions. *G.P. v. State*,, 842 So.2d 1059 (Fla. 4th DCA 2003).

110.   Florida's constitutional privacy provision protects citizens from government's uninvited observation of or interference in those areas that fall within ambit of zone of privacy afforded under provision.  *City of North Miami v. Kurtz*, 653 So.2d 1025 (Fla. 1995), *rehear'g denied, cert. denied* 116 S.Ct. 701, 516 U.S. 1043, 133 L.Ed.2d 658.

111.   President Trump's right to privacy is a fundamental right that requires evaluation under a compelling state interest standard; however, before the right to privacy attaches and the standard is applied, a reasonable expectation of privacy must exist.  *A.H. v. State*, 949 So.2d 234 (Fla. 1st DCA 2007), *rev. denied* 959 So.2d 715.

112.   President Trump has a reasonable expectation of privacy regarding the contents of his estate planning documents and the terms of his revocable trust.

113.   President Trump's expectation of privacy was based on his authentic, subjective expectations as an individual and align with societal values, particularly those interested in deterring a public official by gaining access to private estate

planning information as part of a witch hunt against a political opponent done under the color of law by a public official.

114.   In fact, the right to privacy guaranteed by the Florida Constitution protects the disclosure of financial information of private persons if there is no relevant or compelling reason to require disclosure because personal finances are among those private matters kept secret by most people. *McFall v. Welsh*, 301 So.3d 320 (Fla. 5th DCA 2019).

115.   The right to privacy includes information contained in Florida trusts, particularly when sought for purposes of discovering assets held in trust. *Inglis v. Casselberry,* 200 So.3d 206 (Fla. 2d DCA 2016); *see also Compton v. W. Volusia Hosp. Auth.*, 727 So. 2d 379, 382 (Fla. 5th DCA 1999).

116.   An individual's private financial information and trust documents are entitled to protection by state constitutional right of privacy if there is no relevant or compelling reason to compel disclosure, which normally must be made at an evidentiary hearing. *See id.; see also Mogul v. Mogul,* 730 So.2d 1287 (Fla. 5th DCA1999).

117.   Defendant cannot demonstrate any state interest let alone a compelling one for interfering with President Trump's right to privacy as her true interest lies in her personal vendetta against President Trump that she has relentlessly pursued both before and after gaining office.

118.   Moreover, the State of New York itself has no interest in gaining access to the terms of President Trump's revocable trust nor can James or any of her subordinates articulate one.

119.   Nonetheless, President Trump reasonably fears that James' hand-picked justice will require President Trump to disclose the terms of his revocable trust and fine President Trump $10,000 a day for not providing it if she asks for such relief in the New York Supreme Court, which she has given every indication she will do.

120.   Absent an injunction from a Florida court protecting the privacy of a Florida resident from unlawfully prying nonresidents, James may *gain access to the trust instrument and further violate President Trump's right to privacy without ever needing to present a justification* of any kind.

121.   If James' past conduct is any indication, James will also publicly disclose this information once obtained.  She has vowed to shine a light in every corner of President Trump's affairs.

122.   Privacy, once lost, cannot be regained. The harm is irreparable and palpable.

123.   Similarly, Defendant's conduct threatens to violate President Trump's property rights, which are protected by Article I, Section 2 of the Florida Constitution.

124.    Under Art. I, Sec. 2 of the Florida Constitution, "All natural persons are equal before the law and have inalienable rights, among which are the right to enjoy and defend life and liberty, to pursue happiness, to be rewarded for industry, and to acquire, possess and protect property; except that the ownership, inheritance, disposition and possession of real property by aliens ineligible for citizenship may be regulated or prohibited by law.  Fla. Const. Art I, Sec. 2; *see also Shriners Hosps. for Crippled Children v. Zrillic*, 563 So. 2d 64, 66–67 (Fla. 1990).

125.    The constitutional right to property "includes the incidents of property ownership: the collection of rights to use and enjoy property, *including [the] right to transmit it to others.*"  *Id.* at 67 (emphasis in original, internal quotations omitted). Simply put, "the right to devise property is a property right protected by the Florida Constitution"). *Id.*

126.    Defendant has attempted to exercise extraterritorial control over President Trump's property in the State of Florida as an unlawful prejudgment attachment or restraint in the Civil Action, relief not even available under New York law.

127.    Defendant has intentionally violated the rights of President Trump and will continue to do so unless this Court intervenes.[12]

---

[12] The damages caused to The Trump Organization are practically incalculable but Plaintiff intends to bring an action at a later point against James and the State of New York for the tens of millions of dollars lost and the tremendous cost

WHEREFORE President Trump demands preliminary and permanent injunctive relief restraining James, her agents, servants, employees, and attorneys and all other persons in active concert or participation with her who receive actual notice of the injunction, from requesting, demanding, obtaining, possessing, or disclosing a copy of his revocable trust or the terms thereof, or from exercising any authority or oversight or restraint on his revocable trust, as well as declaratory relief in the form of a declaration declaring that James has no jurisdiction over the assets of a Florida revocable trust and no authority to supplant or control the powers of the trustee of such a trust, and such other and further relief as the Court deems proper, including costs.

## COUNT II
### (Violation of Plaintiff President Donald J. Trump's Rights As Grantor and Beneficiary of the Donald J. Trump Revocable Trust)

128. President Trump re-alleges and incorporates by reference the allegations in paragraphs 1-105 above as if fully set forth herein.

129. President Trump is both the settlor and a beneficiary of the Donald J. Trump Revocable Trust.

---

associated with ridiculous and frivolous litigation.  After seeing what James has tried to do to the Trump Organization and others, many businesses are exiting New York for more friendly environments.  This is all while violent crime skyrockets and the residents lack basic safety in many places.

130.   As such, President Trump holds the power of designating the trustee of the Trust under both the express terms of the Trust and under the Florida Trust Code.

131.   President Trump also retains the right to amend, modify, or revoke the Trust.

132.   Defendant's conduct threatens to interfere with his lawfully protected right to the proper administration of the Trust by supplanting, controlling or monitoring the Trustee and attempting to exercise or restrain the exercise of powers delegated by President Trump to the Trustee or belonging to him alone.

133.   President Trump requires a declaration concerning the rights of his Trustee to control the Trust free from interference by James or puppet New York officials.

134.   President Trump seeks injunctive relief to prevent Defendant's future attempts to unlawfully supplant the Trustee or exercise powers held by the Trustee in any manner, either personally or through an agent.

WHEREFORE President Trump demands preliminary and permanent injunctive relief restraining James, her agents, servants, employees, and attorneys and all other persons in active concert or participation with her who receive actual notice of the injunction, from requesting, demanding, obtaining, possessing, or disclosing a copy of his revocable trust or the terms thereof, or from exercising any

authority or oversight or restraint on his revocable trust, as well as declaratory relief in the form of a declaration declaring that James has no jurisdiction over the assets of a Florida revocable trust and no authority to supplant or control the powers of the trustee of such a trust, and such other and further relief as the Court deems proper, including costs.

Dated this 2nd day of November, 2022.

**WEBER, CRABB & WEIN, P.A.**

/s/ Timothy W. Weber
Timothy W. Weber, Esq.
FBN: 86789
timothy.weber@webercrabb.com
Secondary: lisa.willis@webercrabb.com
Jeremy D. Bailie, Esq.
FBN: 118558
jeremy.bailie@webercrabb.com
carol.sweeney@webercrabb.com
R. Quincy Bird, Esq.
FBN: 105746
Quincy.Bird@webercrabb.com
honey.rechtin@webercrabb.com
5453 Central Avenue
St. Petersburg, Florida 33710
(t): 727-828-9919
(f): 727-828-9924
*Attorneys for President Trump*

| | |
|---|---|
| **From:** | Faherty, Colleen |
| **To:** | Amy Carlin; Lawrence Rosen |
| **Cc:** | Wallace, Kevin; Finkelstein, Alex; Haren, Eric |
| **Subject:** | People v. The trump organization |
| **Date:** | Wednesday, August 31, 2022 6:12:57 PM |

**EXHIBIT A**

Hi Amy and Larry,

We're writing concerning the production of certain documents. After reviewing our records, it appears that TTO has not produced a full set of documents governing Mr. Trump's revocable trust, including any formation documents, amendments to the trust, or other agreements governing the trust's operation. The relevant production, regarding restructuring (from 3/11/22), doesn't seem to have those documents, at least not a full set. Can TTO please produce a set of those documents by the end of this week? (Or, if we are mistaken, and these have been produced, we would appreciate your alerting us to the pertinent Bates numbers).

Related to this issue, we have seen some indication that the trust now is a "Florida grantor trust." See, e.g., TTO_02355681. We are unsure if any document governing the trust has changed that would reflect such a change, but if there has been such a change, please let us know.

We appreciate your prompt attention to these matters. Hope all else is otherwise well.

Best,

Colleen


Get Outlook for iOS

| From: | Alina Habba, Esq. |
|---|---|
| To: | Faherty, Colleen; Wallace, Kevin; Lawrence Rosen; Amy Carlin; Michael Madaio; Finkelstein, Alex; Randee Ingram |
| Subject: | Re: Meet and Confer Request |
| Date: | Friday, September 16, 2022 10:35:56 AM |
| Attachments: | image001.png |

Good morning-

I am working with the attorneys to get you your request without disclosing estate planning information.

Thank you,

Alina Habba, Esq.
Habba Madaio & Associates LLP

---

**From:** Faherty, Colleen <Colleen.Faherty@ag.ny.gov>
**Sent:** Friday, September 16, 2022 8:03:08 AM
**To:** Alina Habba, Esq. <ahabba@habbalaw.com>; Wallace, Kevin <Kevin.Wallace@ag.ny.gov>; Lawrence Rosen <lrosen@lhrgb.com>; Amy Carlin <ACarlin@lhrgb.com>; Michael Madaio <mmadaio@habbalaw.com>; Finkelstein, Alex <Alex.Finkelstein@ag.ny.gov>; Randee Ingram <ringram@habbalaw.com>
**Subject:** RE: Meet and Confer Request

Dear Alina, et al.,

Following up on the below thread regarding the trust documents. Please confirm whether you intend to produce the documents requested.

Additionally, we have noticed an error with certain documents in the productions. In particular we have received documents that were sent password protected in their original transmission, but that once produced to OAG, remained password protected and inaccessible. (see, e.g. TTO_06198993). I can ask our IT folks to give you a better overview of the documents identified, but want to flag it for you in case your IT team has a quick remedy for this. Please let me know.

Thank you.

Best,
Colleen

---

**Colleen K. Faherty** | **Assistant Attorney General**
Executive Division – Federal Initiatives
New York State Office of the Attorney General
28 Liberty Street, 18th floor | New York, NY 10005
Tel: 212.416.6046 | Fax: 212.416.6009

Case 9:22-cv-81780-DMM   Document 1-1   Entered on FLSD Docket 11/16/2022   Page 48 of 126

Colleen.Faherty@ag.ny.gov

---

**From:** Faherty, Colleen
**Sent:** Thursday, September 8, 2022 3:38 PM
**To:** Alina Habba, Esq. <ahabba@habbalaw.com>; Wallace, Kevin <Kevin.Wallace@ag.ny.gov>; Lawrence Rosen <lrosen@lhrgb.com>; Amy Carlin <ACarlin@lhrgb.com>; Michael Madaio <mmadaio@habbalaw.com>; Finkelstein, Alex <Alex.Finkelstein@ag.ny.gov>; Randee Ingram <ringram@habbalaw.com>
**Subject:** RE: Meet and Confer Request

Alina,

Thank you for providing this document; however, I'm afraid this doesn't sufficiently address our request because it does not get at the trust as part of the operating business enterprise that is the Trump Organization. The Donald J. Trump Revocable Trust, in general, holds the entities and properties that comprise the Trump Organization. As a trust, its trustee or trustees are its responsible officials, and a trust typically is governed by the terms set by the grantor in the grant or otherwise later agreed to. Since the trust's business assets have been included within the trust for more than five years, all documents governing the trust's operation, the responsibilities of its trustees and other officials, etc., plainly are pertinent to OAG's investigation. There is no basis to withhold any such documents from production.

Below is an itemized list of the excerpted trust documents we believe we have received. I can't say this is a complete list, but these documents while relevant also do not fully address our request because many are incomplete on their face and we have no assurance that other agreements, amendments, etc., do not exist:

- We have received an excerpted trust document, with only pages 1 and 46 included. The rest of the pages are not included. TTO_02922134.
- We have received portions of a second amendment to the trust. TTO_03451963. It does not appear we have received the full second amendment, nor have we received any first amendment that preceded it.
- As part of a March 11, 2022 production of a closing binder for the late 2016/early 2017 restructuring with numbered files, we received a third amendment. TTO_05698935. We do not know if there were subsequent amendments.
- As part of that same closing-binder production, we received a document appearing to be a set of trust instructions. TTO_05698019. We do not know if this is the only set of instructions, or if there are later sets of instructions or other arrangements or agreements that would govern operation of the trust.

We appreciate your working with us, but are constrained to restate our request for the documents establishing the Donald J. Trump Revocable Trust dated April 7, 2014, any amendments thereto, and any document reflecting a change in the status of that Trust to "a Florida grantor trust". For the avoidance of doubt, the request includes any formation documents, amendments to the trust, or

Case 9:22-cv-81780-DMM   Document 1-1   Entered on FLSD Docket 11/16/2022   Page 49 of 126

other documents governing the trust's operation. We do not understand how a production of this set of documents could be difficult or time-consuming. We ask for production by the end of this week.

Thank you.

Best,
Colleen

_____

**Colleen K. Faherty** | **Assistant Attorney General**
Executive Division – Federal Initiatives
New York State Office of the Attorney General
28 Liberty Street, 18th floor | New York, NY 10005
Tel: 212.416.6046 | Fax: 212.416.6009
Colleen.Faherty@ag.ny.gov

_____

**From:** Alina Habba, Esq. <ahabba@habbalaw.com>
**Sent:** Wednesday, September 7, 2022 3:44 PM
**To:** Faherty, Colleen <Colleen.Faherty@ag.ny.gov>; Wallace, Kevin <Kevin.Wallace@ag.ny.gov>; Lawrence Rosen <lrosen@lhrgb.com>; Amy Carlin <ACarlin@lhrgb.com>; Michael Madaio <mmadaio@habbalaw.com>; Finkelstein, Alex <Alex.Finkelstein@ag.ny.gov>; Randee Ingram <ringram@habbalaw.com>
**Subject:** RE: Meet and Confer Request

Hi Colleen,

In response to your request I am able to provide two **confidential** documents in addition to those that TTO had in their possession and previously produced to the OAG.  As per my call with Kevin and Colleen yesterday, I believe these documents should include all information the OAG is seeking or would require, as is relevant to this investigation, without divulging any of the highly-sensitive estate planning information which we would obviously object to.

Please let me know if I can be of any further assistance.

Very truly yours,


Alina Habba, Esq.
Habba Madaio & Associates LLP

Case 9:22-cv-81780-DMM Document 1-1 Entered on FLSD Docket 11/16/2022 Page 50 of 126

**Alina Habba, Esq.**

*Admitted to Practice in NJ, NY & CT*



HABBA MADAIO
& Associates LLP

1430 US Highway 206, Suite 240

Bedminster, New Jersey 07921

Telephone: 908-869-1188

Facsimile: 908-450-1881

The information in this e-mail is confidential and may be legally privileged. If you are not the intended recipient, you must not read, use or disseminate the information. Although this e-mail and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Habba Madaio & Associates LLP for any loss or damage arising in any way from its use.

**From:** Faherty, Colleen <Colleen.Faherty@ag.ny.gov>
**Sent:** Thursday, September 1, 2022 1:45 PM
**To:** Alina Habba, Esq. <ahabba@habbalaw.com>; Wallace, Kevin <Kevin.Wallace@ag.ny.gov>; Lawrence Rosen <lrosen@lhrgb.com>; Amy Carlin <ACarlin@lhrgb.com>; Michael Madaio <mmadaio@habbalaw.com>; Finkelstein, Alex <Alex.Finkelstein@ag.ny.gov>; Peter Gabra <pgabra@habbalaw.com>; Randee Ingram <ringram@habbalaw.com>
**Subject:** RE: Meet and Confer Request

Hi Alina —

Given the extensive litigation over productions to date, we think it is best to communicate in writing, so please consider this email our meet and confer.

The request is for the documents establishing the Donald J. Trump Revocable Trust dated April 7, 2014 and any document reflecting a change in the status of that Trust to "a Florida grantor trust" as shown in the attached document. For the avoidance of doubt, the request includes any formation documents, amendments to the trust, or other documents governing the trust's operation. We expect these documents will be straightforward to obtain and produce.

As the Trust holds all of the assets valued in the SOFC's and its Trustees are responsible for the presentation of the statements from 2016 forward, these are basic, foundational documents, but we have not been able to identify them (or complete versions of them) in the productions to date. If TTO can identify the relevant bates numbers, great. If not, we would like them produced ASAP. If you decline, we would like to know ASAP. (But we will add that these documents are properly called for

by a number of subpoenas.)

Much appreciated.

Best,
Colleen

_____

**Colleen K. Faherty | Assistant Attorney General**
Executive Division – Federal Initiatives
New York State Office of the Attorney General
28 Liberty Street, 18th floor | New York, NY 10005
Tel: 212.416.6046 | Fax: 212.416.6009
Colleen.Faherty@ag.ny.gov

---

**From:** Alina Habba, Esq. <ahabba@habbalaw.com>
**Sent:** Thursday, September 1, 2022 12:17 PM
**To:** Faherty, Colleen <Colleen.Faherty@ag.ny.gov>; Wallace, Kevin <Kevin.Wallace@ag.ny.gov>;
Lawrence Rosen <lrosen@lhrgb.com>; Amy Carlin <ACarlin@lhrgb.com>; Michael Madaio
<mmadaio@habbalaw.com>; Finkelstein, Alex <Alex.Finkelstein@ag.ny.gov>; Peter Gabra
<pgabra@habbalaw.com>; Randee Ingram <ringram@habbalaw.com>
**Subject:** Meet and Confer Request

[EXTERNAL]

Good morning,

I understand a request was made for additional documents yesterday regarding the trust. Please
provide me with some times that work tomorrow for a meet and confer so I can assist with this and
take a look at what has been provided historically by TTO for you.

Thank you,

Alina Habba, Esq.
Habba Madaio & Associates LLP

**IMPORTANT NOTICE:** This e-mail, including any attachments, may be confidential, privileged or
otherwise legally protected. It is intended only for the addressee. If you received this e-mail in error
or from someone who was not authorized to send it to you, do not disseminate, copy or otherwise
use this e-mail or its attachments. Please notify the sender immediately by reply e-mail and delete
the e-mail from your system.

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

PRESIDENT DONALD J. TRUMP,

    Plaintiff,

                                         CIVIL DIVISION
v.                                     Case No.: 2022ca010792

LETITIA JAMES, individually and in
Her official capacity as Attorney
General of The State of New York,

    Defendant.

_____/

## SUMMONS

THE STATE OF FLORIDA
TO:   Each Sheriff of the State:

      YOU ARE COMMANDED to serve this Summons and Complaint upon:

**LETITIA JAMES, in Her official capacity as Attorney**
**General of The State of New York,**
**Empire State Plaza, Justice Building, 2nd Floor, Albany, NY 12224**

      Each Defendant is required to serve written defenses to the Complaint on Timothy W. Weber, Esq. and Jeremy D. Bailie, Esq. of Weber, Crabb & Wein, P.A., Plaintiff's attorney, whose address is 5453 Central Avenue, St. Petersburg, Florida 33710, within twenty (20) days after service of this summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter. If the Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint.

      WITNESS my hand and the seal of this Court on **Nov 07 2022** .



JOSEPH ABRUZZO
Clerk of the Circuit Court and Comptroller
P. O. Box 4667, West Palm Beach, FL 33402

(SEAL)

By: _____

Deputy Clerk **JOSIE LUCCE**

This notice is provided pursuant to Adminstrative Order No. 2.207-6/22

"If you are a <u>person with a disability</u> who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William H. tchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."

"Si usted es una <u>persona m nusválida</u> que necesita algún acomi dam ento para poder participar en este procedim ento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda.  Tenga la am bilidad de ponerse en contacto con William H. tchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo m nos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inm diatam nte después de recibir esta notificación si e sptiem o antes de la comparecencia que se ha program do es m nos de 7 días; si usted tiene discapacitación del oído o de la voz, llam al 711."

"Si ou se yon m un ki enfim ki bezwen akom dasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William H. tchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal K nte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen im dyatm n apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la m ens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711."

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

IN RE: STANDING ORDER FOR
CASE MANAGEMENT FOR SUBMISSION
OF AGREED CASE MANAGEMENT PLAN FOR
CASES FILED ON OR AFTER APRIL 30, 2021

_____ /

## STANDING ORDER FOR CASE MANAGEMENT AND SUBMISSION OF AGREED CASE MANAGEMENT PLAN IN CIVIL CASES IN THE FIFTEENTH JUDICIAL CIRCUIT FILED ON OR AFTER APRIL 30, 2021 (DCMSO)

Pursuant to Florida Rule of Civil Procedure 1.200(a), Florida Rule of General Practice and Judicial Administration 2.545, and Administrative Order 3.107 entered by the Chief Judge of this Circuit, the parties are informed of the following information and procedures applicable to civil lawsuits filed in the Circuit Court on or after April 30, 2021:

1. **SERVICE OF THIS ORDER.**  The Plaintiff is directed to serve a copy of this Order with each Summons issued in this case.  One copy of this Order is to be filed with the Clerk of the Circuit Court with proof of service.

2. **CIVIL CASE MANAGEMENT SYSTEM.**  The Supreme Court of Florida has established guidelines for the prompt processing and resolution of civil cases.  This Court has adopted a case management system to help meet those guidelines.  In contested cases, the parties are required to participate in the case management system.  The case management system requires early consultation and cooperation among the parties for the preparation and submission of an Agreed Case Management Plan and early involvement by the Court.  The Agreed Case Management Plan requires the parties to identify a case track, confer in good faith and attempt to narrow the matters in controversy, identify the issues that require direct involvement by the Court, and establish a schedule for addressing those issues.[1]  The Agreed Case Management Plan may be accessed at the Court's website at: https://15thcircuit.com/civil-differentiated-forms-and-orders.

Unless all of the Defendants have been served and have been defaulted or dropped, an Agreed Case Management Plan must be submitted to the assigned divisional queue via the Court's online scheduling system (OLS) as an attachment, in PDF format, to a proposed Order Accepting Agreed Case Management Plan on or before 130 days from the date of filing of the initial complaint.  If the parties are unable to agree on an Agreed Case Management Plan by the applicable deadline, a

_____
[1] Case Track options include Expedited, Streamlined, General, or Complex.  Case Tracks have been established in order to comply with the case disposition standards set forth in Florida Rule of General Practice and Judicial Administration 2.250(a)(1)(B).

case management conference will be scheduled by the Court or the Court will review and issue an Order Implementing Case Management Plan without agreement of the Parties. No matters that arise as a result of this standing order, including lack of agreement, will be set on the Court's Uniform Motion Calendar and will, instead, be settled by the Court either at the case management conference or via an Order Implementing Case Management Plan without agreement of the parties. If a case management conference is scheduled, attendance by trial counsel and those parties who are not represented by counsel is mandatory.

If all Defendants are served and defaulted or dropped, the Plaintiff will file the appropriate documentation to pursue a Default Final Judgment within 130 days of the filing of the complaint and Final Judgment is to be entered or set for hearing within 150 days of the filing of the complaint.

        3. **MEDIATION/ALTERNATIVE DISPUTE RESOLUTION (ADR).** ADR provides parties with an out-of-court alternative to settling disagreements. Mediation is a type of ADR wherein an independent third party attempts to arrange a settlement at a conference between the parties. The Court requires the parties to participate in Mediation prior to trial unless the parties agree to another form of ADR.

       **DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, on this 26 day of April, 2021.

15TH JUDICIAL CIRCUIT
ADMINISTRATIVE OFFICE OF THE COURT

**Administrative Circuit Judge**

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA
CIVIL DIVISION

PRESIDENT DONALD J. TRUMP,

    Plaintiff,

v.                                      Case No.: 2022-CA-10792
                                             Division: AF

LETITIA JAMES, individually,

    Defendant.

_____/

## AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF

Plaintiff, PRESIDENT DONALD J. TRUMP ("President Trump"), by and through his undersigned counsel, sues Defendant, LETITIA JAMES ("James" or "Defendant"), and alleges:

### PRELIMINARY STATEMENT

1.    Extraordinary wrongdoing requires extraordinary relief. As set forth below, James has repeatedly abused her position as Attorney General for the State of New York to pursue a vendetta against President Trump, a resident of Palm Beach County, Florida, with the stated goal of destroying him personally, financially, and politically. Suffice it to say that these actions are contrary to both the Constitutions and the laws of New York and Florida and the United States Constitution.

2.     Defendant is an individual guided by personal and political animus and a desire to harass, intimidate, and retaliate against President Trump as a result of his engaging in the First Amendment protected activity of running for and serving as President of the United States, leading the Republican Party, and speaking out on matters of public concern in a manner with which James' happens to disagree.

3.     In furtherance of her persecution of President Trump using the trappings of her office, James has recently become occupied with obtaining a copy of President Trump's revocable trust, the Donald J. Trump Revocable Trust (the "Trust"), a revocable trust instrument governed by Florida law and sited in Florida. The operative Trust documents, executed in Florida with his Florida lawyer in 2020 and 2022, contain President Trump's private estate plan and decisions regarding the disposition of his assets. These are highly private matters between President Trump and his Florida estate-planning lawyer and enjoy constitutional and statutory protection.

4.     Defendant's actions also seek to infringe on the trustee's powers over the Trust and impose substantial interference with the ability of the trustee to discharge the trustee's duties in accordance with § 736.0815, Fla. Stat., § 736.0816 Fla. Stat., and the Trust.

5.     Perhaps most significantly, the true purpose of Defendant's dogged pursuit of President Trump is retaliatory. James simply cannot accept that

President Trump was elected and served as President, is the leading candidate for president in 2024, and speaks on matters in opposition to James' own views.

6.       President Trump's political views, beliefs, and affiliations, and those acts that he has taken in furtherance of his political career, are clearly established as recipients of the highest constitutional protection under the First Amendment to the United States Constitution.

7.       No person, no matter how prominent, should be singled out by state government officials for harassment, investigation, prosecution, or persecution solely for engaging in constitutionally protected activity. Defendant's conduct in doing so was and is intended to stifle President Trump's First Amendment activity, under color of law, because James disfavors the political ideologies, perspectives, opinions, and views held by President Trump and seeks to keep him from holding office again. Such conduct would clearly deter a person of ordinary firmness from engaging in further protected activity.

8.       President Trump comes before this Court for protection from James' efforts to invade his privacy and stifle his First Amendment activity.

9.       President Trump also seeks damages against James individually for the needless litigation costs and fees he has incurred defending himself, his family, and his business interests from Defendant's vexatious pursuit, compensatory damages up to $250,000,000 she is unlawfully attempting to

confiscate from him and his companies in furtherance of the unconstitutional scheme she has employed, and punitive damages.

10.    None of the actions taken by James against President Trump or his family, businesses, employees, or Trust would have been taken absent James' animus and unconstitutionally retaliatory motive. In fact, First Amendment retaliation had become the official policy of James and those she directed as of the first day she took office, long before disgraced former New York attorney Michal Cohen was induced to testify against President Trump (which James claimed to be the predicate of her investigation). The proceedings initiated against President Trump and many others were the carrying out of an unconstitutional policy previously established by James. The entire process was tainted by an unconstitutional design.

## JURISDICTION, PARTIES AND VENUE

11.    This is an action for damages, declaratory and injunctive relief.

12.    The Donald J. Trump Revocable Trust (the "Trust") is a Florida revocable trust established and governed by the laws of the State of Florida. Its principal place of administration is in Florida.  It is governed by documents created in 2020 and 2022 which remain in the possession of President Trump's private estate planning attorney. Plaintiff has the right to amend, modify, or revoke the Trust at any time.

4

13.     President Donald J. Trump is the settlor and a beneficiary of the Trust and resides in Palm Beach County, Florida.

14.     Circuit courts have original jurisdiction over all equitable claims pursuant to § 26.012(2)(c), Fla. Stat., as well as all actions at law where the amount in controversy is in excess of $30,000, exclusive of interest, costs and attorneys' fees.

15.     The Court has concurrent jurisdiction to consider claims under 42 U.S.C. § 1983 brought to vindicate the deprivation of "rights, privileges, or immunities secured by the Constitution."

16.     Pursuant to Florida Statutes, this Court may also act to protect and carry out the administration of a trust to the extent the Court's jurisdiction is invoked by an interested person or as provided by law. *See* § 736.0201(2), Fla. Stat.

17.     Venue for actions and proceedings concerning trusts, including those seeking a declaration of rights or other matters concerning trustees and beneficiaries under § 736.0201, may be laid in any county where the beneficiary suing or being sued resides. *See* § 736.0204, Fla. Stat.  In addition, venue against a non-resident may be laid in any county.

18.     This Court has personal jurisdiction over James, a non-resident, based on her unlawful attempts to reach into Florida and exercise powers delegated to the Trustee, as § 736.0202, Fla. Stat. provides, in relevant part:

> (a) Any trustee, trust beneficiary, **or other person, whether or not a citizen or resident of this state, who personally or through an agent** does any of the following acts related to a trust, **submits to the jurisdiction of the courts of this state involving that trust:**
>
> …
>
> (4) Accepts or **exercises a delegation of powers or duties from the trustee** of a trust having its principal place of administration in this state.

(emphasis supplied); s*ee Electro Eng'g Prods. Co. v. Lewis,* 352 So.2d 862, 864 (Fla.1977) (a plaintiff seeking to obtain jurisdiction over a nonresident defendant initially needs only to allege sufficient facts to make out a prima facie case of jurisdiction).

19.    This Court also has personal jurisdiction over James individually based on the tortious acts she committed both within and without this state that were directed at Plaintiff, a Florida resident, and his children, also Florida residents, and several of his Florida businesses.

20.    The tortious acts and scope of authority James seeks to exert over real property and other Trust assets also satisfy the minimum contacts requirements of due process. *See* § 48.193(1)(a)(2), Fla. Stat.; *Venetian Salami Co. v. Parthenais*, 554 So.2d 499, 502 (Fla. 1989) (establishing a two-step inquiry for determining whether long-arm jurisdiction over a non-resident in a given case is proper: (i) facts satisfying the long-arm statute, and (ii) minimum contacts to satisfy due process requirements).

21.    As to the first step of the *Venetian Salami* inquiry, President

Trump's claim under 42 U.S.C. § 1983 alleges an intentional tort by Defendant.

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709, 119

S. Ct. 1624, 1638, 143 L. Ed. 2d 882 (1999) (holding "there can be no doubt that

claims brought pursuant to § 1983 sound in tort"). And while mere economic

injury is insufficient to confer personal jurisdiction without accompanying

personal injury, the U.S. Supreme Court has found that the alleged harm

suffered by a § 1983 plaintiff is best characterized as a personal injury. *Wilson*

*v. Garcia*, 471 U.S. 261, 278 (1985) (characterizing § 1983 actions as involving

claims for personal injuries). This satisfies § 48.193(1)(a)(2), Fla. Stat.

22.    As to the second step, President Trump returned to his Palm Beach

County residence in January 2021, and Defendant, acting under the color of

law, has continuously published content viewed in Florida, issued subpoenas

and summonses directed to President Trump and other Florida residents, and

generally pursued him, his business interests in Florida, and his Florida

revocable trust in an attempt to stifle the exercise of his constitutional rights

in Florida. This conduct satisfies the minimum contacts requirement.

23.    Unless judicial relief is provided as described herein, President

Trump will be irreparably deprived of speech, privacy, and other rights by

James.

24.     All conditions precedent to the maintenance of the causes of action alleged herein, if any, have occurred or been performed, excused, or waived.

## GENERAL ALLEGATIONS

### I.     Defendant's Longstanding Animosity Toward President Trump

25.     Prior to serving as Attorney General of the State of New York, Defendant served as a Democratic member of the New York City Council and New York City Public Advocate for over a decade.

26.     After President Trump's victory in the 2016 Presidential Election, Defendant began displaying severe animosity towards then President-elect Trump.

27.     Even before President Trump's inauguration, Defendant retweeted calls for sit-ins to protest President Trump's nomination of Jeff Sessions to be United States Attorney General.

28.     Five days after President Trump's inauguration, Defendant joined public protests and declared that his "administration ha[d] shown its true and ugly colors, but we will not be silent."

29.     Over the next several months, Defendant continued to publicly voice her disdain for President Trump and his administration.[1]

---

[1] *See, e.g.*, *id.*, (Feb. 11, 2017, 12:01 PM ET) https://bit.ly/3liyZpK  ("@villagedemocrat out in full force today calling on our elected officials to fight for us against this administration."); *id.*, (Mar. 5, 2017, 5:01 PM ET) https://bit.ly/2Gl6c56 ("Hey @realDonaldTrump, we're in Queens, your hometown, rising up against your xenophobic policies, & we're ready to act."); *id.*, (June 3,

30.     Six and a half months into President Trump's term, Defendant was already leading "die-in" protests against President Trump because, according to her, "we are all being killed by this administration."[2] Defendant punctuated her tweet with the hashtag, "Resist."

31.     The hashtag "#Resist" is recognized as shorthand for fighting President Trump at every level in an effort to make President Trump and his supporters "uncomfortable and not able to rest well" and thus unable to effectively implement policy.[3]

32.     Defendant's embrace of the "resistance" mentality from the earliest days of the Trump presidency foreshadowed her relentless abuse of power as Attorney General.

33.     Roughly ten months into President Trump's term, Defendant announced: "I've been leading the resistance against Donald Trump in NYC and will only continue to do so in every way possible."[4]

34.     In her capacity as New York City Public Advocate, Defendant demonstrated a willingness to wield the government's power against those

---

2017, 10:18 AM ET) https://bit.ly/33z0XYj ("Always proud to be with strong New York women standing up & speaking out against an administration that doesn't represent out values.").

[2] *id*. (Aug. 14, 2017, 5:55 PM ET) https://bit.ly/3lu9fqz .

[3] *'Resist' is a Battlecry, But What Does It Mean?* The New York Times, Feb. 14, 2017, https://nyti.ms/2GLln77 .

[4] *Id*., (Oct. 16, 2017, 7:57 PM ET) https://bit.ly/3d4wBQr emphasis added).do so in every way possible." Id., (Oct. 16, 2017, 7:57 PM ET) https://bit.ly/3d4wBQr (emphasis added).

whose political beliefs differed from her own.[5] That willingness took center stage in Defendant's political campaign for attorney general and her subsequent actions as New York's chief law enforcement officer.

## II.   Defendant Campaigned for Attorney General on a Promise to Target President Trump and the Trump Organization

35.   In May of 2018, Defendant declared her candidacy for Attorney General of the State of New York.

36.   As a candidate for Attorney General, Defendant made "taking on Donald Trump"[6] the focal point of her campaign, often comparing herself to Special Prosecutor Robert Mueller, who, at the time, was leading the investigation into the now-debunked allegations that the Trump campaign colluded with Russians to interfere in the 2016 presidential election.

37.   Defendant's campaign website not only repeated derogatory and inaccurate statements concerning President Trump's policies but also stated— with no evidentiary basis whatsoever— that President Trump had engaged in "public corruption."[7]

---

[5] *See id.*, (July 19, 2017, 10:32 AM ET) https://bit.ly/2F3wHLt ("We will not allow companies that build Trump's wall, a monument to racism and bigotry, to also do business with NYC.")

[6] See, e.g., Letitia James (@TishJames), Twitter (June 27, 2018, 10:48 AM ET) https://bit.ly/2GG4uuy ("Congrats [now-Congresswoman Alexandria Ocasio Cortez] on your victory. Looking forward to working with you to help Democrats take on Donald Trump.")

[7] http://www.tishjames2018.com/corruption/

38.     Though it appears to have since been removed, the website at one time provided a link to a detailed outline of Defendant's strategy for rooting out corruption, with a section specifically devoted to attacking President Trump, his family, and the Trump Organization entitled "*Investigate Trump's New York Business.*"

39.     As stated in the outline, the investigation would include:

> a review of Trump-related real estate transactions, especially those in which the Trump family suddenly started paying cash for properties after years of operating their businesses exclusively by borrowing money.

40.     Defendant had no personal knowledge about any "Trump-related real estate transactions" at the time that she made these statements and possessed no information or insight into President Trump's financing arrangements other than what she had presumably seen in the media.

41.     Nonetheless, Defendant continued to shamelessly campaign on her unfounded allegations against President Trump and his family in a misguided effort to garner media attention and promote her fundraising efforts.

42.     On June 26, 2018, Defendant spoke at a protest opposing the Supreme Court's decision in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), telling the crowd that "it's critically important that we all understand that this was a

11

result of the fact that [Republicans] stole the Supreme Court seat. An illegitimate president and an illegitimate member of the Supreme Court."[8]

43.     On July 1, 2018, Defendant tweeted "New Yorkers need a fighter who will take on Donald Trump … I'll be that fighter. Join my campaign."[9]

44.     On July 19, 2018, in the midst of a politically-charged speech before The Bronx Democratic Party, Defendant promised to use the law as a "sword" to relentlessly bombard President Trump, proclaiming that "no one is above the law, including this illegitimate president…and so *I look forward to going into the office of Attorney General every day, suing him, defending your rights, and then going home!*"[10]

45.     In what can only be construed as an attempt to threaten and intimidate President Trump, Defendant then tweeted that President Trump is "running out of time" and warned him that she would immediately investigate him and his "cronies" when she took office.

46.     Defendant issued a similar threat on August 22, 2018, when she said, among other things, that President Trump "should be scared" about her upcoming term.

---

[8] *Letitia James Foley Sq Opposing Travel Ban Supreme Court Decision*, YouTube, 0:55 (June 26, 2018) https://bit.ly/3d58PDS.

[9] Letitia James (@TishJames), Twitter (July 1, 2018, 2:56 PM ET) https://bit.ly/3nh8rH4

[10]     Letitia     James,     Facebook,     1:18     (July     19,     2018)     (emphasis     added), https://m.facebook.com/LetitiaJamesforNY/videos/203059860348974.

47.     On September 10, 2018, Defendant vowed to "stand up" to Trump, and later that evening, Defendant declared once more that she was "just getting started" in "tak[ing] on" President Trump.

48.     Of course, even when addressing President Trump's role as the sitting President of the United States, James was driven by deep animosity for him personally and an obsessive denial that he had the right to hold public office.    In a troubling September 12, 2018 video, released during the Democratic primary, Defendant pledged that she would "never be afraid to challenge this illegitimate president."

49.     In the very same video, Defendant baselessly accused President Trump of a slew of crimes, including obstruction of justice and laundering money from foreign governments, and demanded that he be indicted. Defendant promised to "join with law enforcement and other attorney generals across this nation *in removing this President from office*." Mirroring her previous allegations, Defendant's call for President Trump to be investigated was devoid of both fact and merit. Nevertheless, Defendant concluded the video by promising that "the days of Donald Trump are coming to an end."

50.     On the same day, Defendant took to Twitter to double down, reiterating her warrantless claim that President Trump is an "illegitimate president" and promising once more to "fight back" against Trump if New Yorkers voted for her.

### III. As Attorney General, Defendant Immediately Implemented her Premeditated, Ongoing Plan of Intimidation and Harassment of President Trump

51.     On November 6, 2018, Defendant was elected, as a Democrat, the Attorney General of the State of New York and immediately began implementing her plan to weaponize her office to attack President Trump in a manner exceeding conventional political opposition. During her victory speech, she made a solemn promise to "shin[e] a bright light into every dark corner of [Trump's] real estate holdings," making no distinction between holdings located in New York and those located elsewhere, including Florida.

52.     Emboldened by her election, Defendant began to shamelessly display the bias against President Trump that she demonstrated before gaining office, publicly guaranteeing the outcome of any future investigation or claim against President Trump. These guarantees were made before she had ever established even a pretext of legal predicate for an investigation, claim, or action, and before gathering any facts or requesting documents from President Trump in connection with an investigation, claim, or action.

53.     In a stark example, in an interview with political activist and former Democratic candidate for New York City Council Adina Sash, Defendant was asked if she planned to "sue [President Trump and the Trump Organization]." Defendant laughingly responded "[o]h, we're definitely going

14

to sue him.  We're going to be a real pain in the ass.   He's going to know my name personally."

54.    Then, on December 12, 2018, during an NBC News interview given eighteen days before assuming office, Defendant vowed to "use every area of the law to investigate President Trump and his businesses transactions and that of his family as well." Notably, Defendant did not curtail her persecution of Trump and his family, instead promising to also investigate "anyone in [President Trump's] orbit."

55.    Defendant repeatedly, publicly, and proudly stated during her campaign and transition period that she intended to weaponize her office to target and intimidate President Trump upon taking office. This ensured her policy of intimidation would be in place on day one.

56.    In fact, Defendant's open threats and promises to investigate and sue President Trump were so appalling that even members of her party condemned them as unlawful.

57.    For instance, Daniel Goldman, the Democratic Party's counsel for the impeachment process against President Trump and a former Assistant United States Attorney in Manhattan, warned that Defendant's statements "give the appearance of an individualized political vendetta . . . It's essential that prosecutors maintain their neutrality and an objective view of the fact evidence, no matter the politics involved." By abandoning even the pretext of

such neutrality, Goldman stated Defendant "[went] too far in allowing politics to shape her agenda."

58.     In sum, before assuming office, Defendant promised to investigate President Trump dozens of times over many months, before obtaining *any* information specific to her eventual public office that could supply an authentic predicate to an unbiased investigation or action against President Trump. Her campaign promises and transition plans to investigate President Trump's business activities and associates were based on information no greater than that available to any other citizen and establish that the Defendant brought a premeditated policy of intimidation and harassment to her role as Attorney General.

59.     Defendant was sworn in as Attorney General of New York on January 1, 2019.  In so doing, Defendant swore to support the Constitution of the United States and faithfully discharge the duties of Attorney General. Unfortunately, she must have had her fingers crossed behind her back when she did so.

60.     Upon assuming her role, Defendant immediately went to work making good on her campaign promises and established her premeditated policy of intimidation and harassment of President Trump as the policy of her office.

61.     From that point forward, Defendant's actions assumed the color of law, although irredeemably tainted by Defendant's pre-established policy of intimidation and harassment.

**IV.   Defendant's Policy of Intimidation and Harassment Leads to the Special Proceeding**

62.     On January 3, 2019, three days after she was sworn in as Attorney General, Defendant told CNN that she would "ensure that the man currently occupying the Oval Office is held accountable to [sic] any and everything he has done."

63.     Defendant further stated that she would "never be afraid to challenge this illegitimate president" and that investigating Trump "fuels [her] soul."

64.     On March 11, 2019, Defendant employed the authority and vast array of resources of the Office of the Attorney General to formally open an investigation of the Trump Organization and issued subpoenas to Deutsche Bank and Investors Bank "for records relating to the financing of four major Trump Organization projects."

65.     The subpoenas were "a culmination of months of threats from [Defendant] that she would aggressively investigate Mr. Trump."

66.     Defendant later claimed as grounds for initiating the investigation of President Trump that she relied upon February 19, 2019 testimony given by

Michael Cohen ("Cohen"), a discredited, disgraced, and disgruntled[11] former attorney of President Trump who evaded taxes on income from his taxicab medallions, made false statements to financial institutions for personal gain, and lied to Congress.

67.     Defendant's claim of reliance on Cohen's testimony was pretext, not predicate. Defendant had established as policy the retaliation against President Trump and publicly announced her intent to initiate investigations in search of a crime years before Cohen testified before Congress.

68.     Moreover, Defendant used her six weeks in office before Cohen's testimony to establish an official policy of intimidating and harassing President Trump.

69.     Defendant openly flouted her duty to remain neutral in public commentary pertaining to an ongoing investigation. Defendant continued to disparage President Trump and the Trump Organization throughout 2019, even floating outright lies.

70.     For example, on April 23, 2019, Defendant repeated her prior, unfounded allegation that President Trump and the Trump Organization were engaged in criminal activity: "We need to focus on Donald Trump and his

---

[11] Mr. Cohen's most recent lawsuit against President Trump was dismissed the day before this filing. *See Cohen v. United States of America*, et al., 21-CV-10774 (S.D. NY November 14, 2022) (Liman, J.).

abuses . . . we need to follow his money . . . we need to find out where he's laundered money . . . ."

71.     Defendant fabricated these allegations out of thin air, indicating that even after assuming her office and initiating investigations her desire to pursue President Trump was driven by bias, political animus, and the most severe case of Trump Derangement Syndrome.

72.     With this mindset firmly established, even after the Cohen testimony, it is clear any stated predicate for initiating an investigation was merely a pretext for achieving her overall goal of intimidating and harassing President Trump and the Trump Organization to garner undeserved publicity for herself as a politician and harm President Trump and "anyone in his orbit."

73.     Defendant's conduct continued. On July 23, 2019, Defendant tweeted that Trump "has spent his career hiding behind lawsuits" and promised to "vigorously fight" him.

74.     Two and a half weeks later, Defendant served a subpoena *duces tecum* on President Trump, the Trump Organization's corporate officers, President Trump's children, and third parties for information and testimony about a wide range of properties across the country, specifically including many in Florida.

75.     On August 24, 2020, Defendant commenced a special proceeding under Article 4 of the New York Civil Practice Law and Rules, in New York

Supreme Court, New York County, ostensibly to compel compliance with the subpoenas previously issued. *See People v. The Trump Organization*, No. 451685/2020 (the "Special Proceeding").

76.    Under Defendant's leadership the Office of the Attorney General has been reduced to nothing more than a weapon in James' arsenal to wage war on President Trump.  This is made abundantly clear by the fact that August 24, 2020 was also, conveniently, the first day of the Republican National Convention.  Clearly, Defendant's true goal was the ongoing intimidation and harassment of President Trump with the intent of causing him harm.

77.    As a result of the subpoenas, President Trump and his companies produced over 8 million pages of documents. Still, James was not satisfied.

V.    **Defendant's Policy of Pursuing President Trump Accelerated Post-Presidency.**

78.    President Trump left office on January 20, 2021, but as a private citizen he has remained in the public eye and remains widely viewed as the leader of the Republican Party. Since leaving office, he has publicly promoted policies and candidates he favors while opposing the disastrous policies of the Biden Administration and other Democrats, which he believes have so badly hurt our nation.

20

79.     Defendant, emboldened by the November 2020 elections, hoped for a personal political lift by associating her Office's unjust pursuit of President Trump and the Trump Organization with his departure from office.

80.     Defendant declared her candidacy for Governor of New York State on October 29, 2021.

81.     In her announcement video, she boasted that she "sued the Trump Administration 76 times, but who is counting?"  In making this statement, Defendant signaled that she had planned to make "taking on Trump" the centerpiece of yet another statewide campaign.

82.     On December 9, 2021, amid poor polling numbers, Defendant suspended her campaign for Governor of New York.  The reason behind the lack of support for her gubernatorial candidacy remains unclear, but aside from her dogged pursuit of President Trump, Defendant's record as Attorney General has little to show. Perhaps the public had reservations over electing as their governor a Javert-style persecutor driven by personal vendettas against political opponents. Perhaps some voters were tired of her commitment to a political witch hunt given the statewide crime rate or considered her unqualified or unlikable.

83.     In any event, at her withdrawal from the gubernatorial race Defendant stated, "I have come to the conclusion that I must continue my work as attorney general.  There are a number of important investigations and cases

21

that are underway, and I intend to finish the job.   I am running for reelection to complete the work New Yorkers elected me to do."

84.    By saying this, Defendant left no doubt that she remained undeterred from her relentless pursuit of her investigation of "all things Trump" and would use it in her run for reelection.

85.    Unlike the campaign promises of her first run, however, Defendant's reelection strategy would need to be fueled by action. This required her to move beyond the investigation that drove the Special Proceeding and toward a civil action.

**VI.   Defendant Initiates a Civil Enforcement Action Against President Trump Pursuant to her Policy of Intimidation and Harassment**

86.    On September 21, 2022, Defendant commenced a civil action in the Supreme Court of the State of New York, New York County, *entitled People of the State of New York, et al. v. Donald J. Trump*, et al, Index No. 452564/2022 (the "Civil Action") by directing a subordinate, consistent with Defendant's established policy of intimidation and harassment of President Trump and "anyone in his orbit", to file a complaint pursuant to the authority granted to the Office of the Attorney General of the State of New York under Executive Law § 63(12) ("E.L. 63(12)"). That same day, Defendant held a press conference publicly announcing that President Trump and his children had committed violations of federal criminal law and that she was *publicly* referring them to

the United States Attorney for the Southern District of New York and the Internal Revenue Service. These statements were intended to harm these Florida residents and further chill their expressive activity.

87.     Defendant next directed a subordinate, consistent with her policy of intimidation and harassment of President Trump, to seek a preliminary injunction to restrain and supervise (i.e., destroy) his companies.

88.     James seeks to extend oversight and control to President Trump's Florida revocable trust, threatening to substantially interfere with the ability of the trustee of the Trust to carry out its provisions and discharge his duties in accordance with Florida law.

89.     Similar to how Defendant timed her initiation of the Special Proceeding to maximize her own political benefit and damage President Trump, Defendant's request for preliminary judicial intervention in the Civil Action was designed to create a media sensation that would damage President Trump and raise her own political profile days before the national midterm elections and her own bid for reelection

90.     In context, Defendant's efforts to obtain control over President Trump's business organization, including the Trust, is the culmination of her endless public promises to investigate President Trump and anyone in his circle. It follows her frequent public disparagement of President Trump, her accusations of criminal conduct, her aggressive and wide-sweeping

investigation into President Trump's business activities that led to and included the Special Proceeding, and now the initiation and prosecution of the Civil Action and more inter-agency referrals for more investigations and more prosecutions.

91.    On October 31, 2022, James filed additional documents revealing her zeal to obtain a copy of President Trump's Florida-based revocable trust. A copy of this correspondence is attached as **Exhibit A.**[12]

92.    President Trump, a Florida resident with the right to revoke, amend, or modify the terms of his revocable trust at any time before it becomes irrevocable, requires protection from James' demand to invade his privacy.

93.    After becoming aware of this action for an injunction to restrain her from obtaining the revocable trust document, James immediately attempted to get it. On November 3, 2022, the day after this suit was filed, James, through a subordinate, filed a letter (the "November 3 Letter") in the Civil Action addressed to the New York Judge complaining about the instant lawsuit. A copy of this correspondence is attached as **Exhibit B.**[13]

---

[12] The Court may and should take judicial notice of **Exhibit A,** a true and correct copy of "*Faherty Reply Affirmation Exhibit E*," filed by Defendant's office as NYSCEF Doc. No. 164 in the Civil Action. See *Dufour v. State*, 69 So. 3d 235, 253 (Fla. 2011), *as revised on denial of reh'g* (Aug. 25, 2011) (quoting § 90.202 Fla. Stat. and finding the statute permits a court to take judicial notice of various matters including "[r]ecords of any court of this state or of any court of record of the United States or of any state, territory, or jurisdiction of the United States.")

[13] The Court may take judicial notice of **Exhibit B,** a true and correct copy of the "November 3 Letter," filed by Defendant's office as NYSCEF Doc. No. 182 in the Civil Action. See *Dufour*, 69 So. 3d at 253.

94.     Defendant baselessly asserted in the November 3 Letter that the revocable trust and all amendments to it were "key documents" that are "obviously relevant" to the Civil Action. These statements were knowingly false as a person's intended disposition of their assets could never be relevant in a legal proceeding during their lifetime, something any trained lawyer, and certainly a State Attorney General, should appreciate.

95.     The November 3 Letter also claimed that by initiating this action President Trump was attempting to "put assets beyond the reach" of the State of New York. Again, James' claims were knowingly false and outrageous since James sued the corporate entities ultimately owned by the revocable trust that in turn contain the assets, including immovable real estate in New York City worth multiples of what James was seeking in the Civil Action lawsuit. Due to her many pretexts for invading President Trump's private dealings, and numerous false allegations, this action was initiated to protect President Trump from James, a stalker with a law license and government position. James' conduct violates President's Trump's right to privacy in the Trust, which is protected by the Fourteenth Amendment of the United States Constitution, the Florida Constitution, and the common law.

96.     Zooming out, it becomes clear that the Civil Action and the Defendant's efforts to secure and oversee the Trust are just the most recent salvo in Defendant's broader battle of discrimination and retaliation against

25

President Trump for exercising his constitutionally protected rights to free speech and free association, which conduct is ongoing and threatens to continue given James' recent reelection.

97.     Absent judicial relief, including the permanent and temporary injunctive relief sought, James will continue her campaign to obtain the revocable trust instrument, interfere in the administration of the revocable trust, interfere with President Trump's right to revoke the revocable trust, and irreparably harm President Trump and assets he controls in the State of Florida which employ nearly a thousand employees in the State.

## COUNT I

### (42 U.S.C. § 1983) – Freedom of Speech and Association, Privacy, Due Process, Equal Protection, Privileges & Immunities

98.     Plaintiffs re-assert and re-allege the allegations contained within paragraphs 1 through 97 as if fully set forth herein.

99.     Defendant's conduct, described above, has variously violated President Trump's rights protected by the First and Fourteenth Amendments of the United States Constitution.

100.    The First Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, guarantees, *inter alia*, the rights to freedom of speech and freedom of association.  U.S. Const. Amend. I.; *see, e.g.,*

*NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *Bates v. City of Little Rock*, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960).

101.   The United States Supreme Court has clearly established that political speech is the most protected form of speech under the First Amendment.

102.   Freedom of association is also protected by the First Amendment.

103.   President Trump, the Forty-Fifth President of the United States, is a prominent political figure and considered by many to be the head of the Republican Party.

104.   President Trump's political views, beliefs, and affiliations, and those acts he has taken in furtherance of his political career, are a form of political speech subject to the highest constitutional protection under the First Amendment.

105.   The right to freedom of association grows out of the First Amendment's guarantees of the rights to peaceable assembly and freedom of speech. The associational privilege exists "for the purpose of advancing ideas and airing grievances" and is indisputably protected against state actors by the Due Process Clause of the Fourteenth Amendment. *Eccles v. Nelson*, 919 So. 2d 658, 661 (Fla. 5th DCA 2006) (citing *Bates*, 361 U.S. 516).

106.   The associational privilege also "protects against compelled disclosure that would adversely affect an organization by 'induc[ing] members

27

to withdraw ... and dissuading others from joining because of fear of exposure.'" *Fla. State Conf. of Branches & Youth Units of NAACP v. Lee*, 568 F. Supp. 3d 1301, 1307 (S.D. Fla. 2021) (citing *NAACP*, 357 U.S. at 463).

107.  Here, Defendant's repeated and unapologetic desire to retaliate against President Trump and "anyone in his orbit," through any means available to her, present an affront to the United States' Constitution's guarantee of President Trump's speech and associational rights.

108.  Defendant's actions violate, among other things, President Trump's rights to substantive due process, speech, association, equal protection of the law, and the privileges and immunities protected by the Fourteenth Amendment.

109.  Defendant's conduct also violates President Trump's right to privacy secured by the Fourteenth Amendment to the United States Constitution.

110.  The right to privacy is deeply rooted in this nation's history and tradition and is a clearly established component of the Due Process Clause of the Fourteenth Amendment. *See Griswold v. Connecticut*, 381 U.S. 479 (1965); *Dobbs v. Jackson Women's Health Org.*, 213 L. Ed. 2d 545, 142 S.Ct. 2228 (2022).

111.  The right to privacy involves both the individual interest in (i) avoiding disclosure of personal matters, and (ii) the interest in independence

in making certain kinds of important decisions. *Whalen v. Roe*, 429 U.S. 589, 598–600 (1977) (collecting cases).

112.   As part of her unconstitutional scheme, Defendant seeks access to the trust instrument of the Donald J. Trump Revocable Trust. President Trump has a legitimate expectation of privacy in the Trust instrument and Defendant has not, and cannot, advance a legitimate, compelling state interest in obtaining the Trust instrument. Moreover, based upon past conduct of James, it is reasonable to conclude that James would widely publish the instrument once obtained.

113.   Defendant's conduct in commencing and continuing the Civil Action, making numerous referrals to other agencies about President Trump and his family members, and other conduct is intended to stifle his free speech, isolate him from current and future associates, and expose his private information needlessly.

114.   Defendant has harmed President Trump's rights to free speech, free association, and privacy in both a discriminatory and retaliatory manner.

115.   At all relevant times, Defendant was acting under the pretense and color of the law.

116.   Plaintiffs' First Amendment and Fourteenth Amendment rights have been, and continue to be, wrongfully infringed upon by way of James' unlawful abuse of her authority and deployment of state power to discriminate

against, retaliate against and otherwise suppress the rights of free speech belonging to President Trump.

117.   As a direct and proximate result of Defendant's conduct, President Trump has suffered, and will continue to suffer, significant, imminent and irreparable harm in the form of deprivation of his constitutionally protected rights, privileges, and immunities afforded under the First Amendment and the Fourteenth Amendment, as secured by 42 U.S.C. § 1983.

118.   In addition to the declaratory and injunctive relief sought herein, President Trump is also entitled to an award of attorneys' fees, costs, and disbursements pursuant to 42 U.S.C. § 1988.

119.   While the full harm to President Trump's clearly established constitutional rights is irreparable, Defendant's overarching plan to vex everyone in President Trump's circle has had pecuniary effect on President Trump's businesses, business relationships, and brand value. The Civil Action alone seeks to confiscate $250,000,000 from President Trump, which action would not have occurred but for James' unconstitutional scheme.

120.   President Trump has thus been damaged by Defendant's unlawful conduct at trial but includes: (1) potentially as high as $250,000,000 in confiscation from the civil action; (2) legal fees and costs incurred in defending against the campaign of retaliation; (3) and other damages in an amount to be proven at trial.

121.   The conduct of James was malicious, done with evil intent, and in callous disregard of President Trump's federally protected rights.

WHEREFORE President Trump demands declaratory and injunctive relief, compensatory and punitive damages, attorneys' fees, costs, and such other and further relief as the Court deems proper.

## COUNT II

### (Violation of Plaintiff President Donald J. Trump's Rights to Privacy and Property Protected by Florida Law)

122.   Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1-97 above as if fully set forth herein.

123.   President Trump is a natural person residing in Florida with the right to be left alone from governmental intrusion into his private life under Article I, Section 23 of the Florida Constitution. He also enjoys substantial common law privacy protections from private actors who would tortiously invade his privacy.

124.   A right to privacy is a personal one, and intentional damage to an individual's rights to privacy is personal injury and tortious.

125.   The constitutional right of privacy ensures that individuals are able to determine for themselves when, how, and to what extent information about them is communicated to others. *Weaver v. Myers*, 229 So.3d 1118 (Fla. 2017).

126. The right to privacy recognized by the Florida Constitution encompasses at least two different categories of interest; the first is the individual interest in avoiding disclosure of personal matters, while the second is the interest in independence in making certain kinds of important decisions. *G.P. v. State,*, 842 So.2d 1059 (Fla. 4th DCA 2003).

127. Florida's constitutional privacy provision protects citizens from government's uninvited observation of or interference in those areas that fall within ambit of zone of privacy afforded under provision.  *City of North Miami v. Kurtz*, 653 So.2d 1025 (Fla. 1995), *rehear'g denied, cert. denied* 116 S.Ct. 701, 516 U.S. 1043, 133 L.Ed.2d 658.

128. President Trump's right to privacy is a fundamental right that requires evaluation under a compelling state interest standard; however, before the right to privacy attaches and the standard is applied, a reasonable expectation of privacy must exist.  *A.H. v. State*, 949 So.2d 234 (Fla. 1st DCA 2007), *rev. denied* 959 So.2d 715.

129. President Trump has a reasonable expectation of privacy regarding the contents of his estate planning documents and the terms of his revocable trust.

130. President Trump's expectation of privacy was based on his authentic, subjective expectations as an individual and align with societal values, particularly those interested in deterring a public official from gaining

access to private estate planning information as part of a witch hunt against a political opponent done under the color of law.

131.  In fact, the right to privacy guaranteed by the Florida Constitution protects the disclosure of financial information of private persons if there is no relevant or compelling reason to require disclosure because personal finances are among those private matters kept secret by most people. *McFall v. Welsh*, 301 So.3d 320 (Fla. 5th DCA 2019).

132.  Florida's fundamental right to privacy guaranteed by the Florida Constitution provides an individual protection "from intrusion or coercion, whether by government or by society at large." *Green v. Alachua Cnty.*, 323 So. 3d 246 (Fla. 1st DCA 2021). It thus provides a guide for courts to evaluate invasions of privacy by private persons, particularly those individuals, like Defendant, who act under the color of law.

133.  The right to privacy includes information contained in Florida trusts. *Inglis v. Casselberry,* 200 So.3d 206 (Fla. 2d DCA 2016); *see also Compton v. W. Volusia Hosp. Auth.*, 727 So. 2d 379, 382 (Fla. 5th DCA 1999).

134.  An individual's private financial information and trust documents are entitled to protection by state constitutional right of privacy if there is no relevant or compelling reason to compel disclosure, which normally must be made at an evidentiary hearing. *See id.; see also  Mogul v. Mogul,* 730 So.2d 1287 (Fla. 5th DCA 1999).

135.   Defendant cannot demonstrate any legitimate interest let alone a compelling one for interfering with President Trump's right to privacy as her true interest lies in her personal vendetta against President Trump that she has relentlessly pursued both before and after gaining office.

136.   Absent an injunction from a Florida court protecting the privacy of a Florida resident from unlawfully prying nonresidents, James may gain access to the Trust instrument and further violate President Trump's right to privacy without ever needing to present a justification of any kind.

137.   If James' past conduct is any indication, James will also publicly disclose this information once obtained.  She has maliciously vowed to shine a light in every corner of President Trump's life.

138.   Privacy, once lost, cannot be regained. The harm is irreparable and palpable.

139.   Similarly, Defendant's conduct threatens to violate President Trump's property rights, which are protected by Article I, Section 2 of the Florida Constitution.

140.   Under Art. I, Sec. 2 of the Florida Constitution, "All natural persons are equal before the law and have inalienable rights, among which are the right to enjoy and defend life and liberty, to pursue happiness, to be rewarded for industry, and to acquire, possess and protect property; except that the ownership, inheritance, disposition and possession of real property by

aliens ineligible for citizenship may be regulated or prohibited by law." Fla. Const. Art I, Sec. 2; *see also Shriners Hosps. for Crippled Children v. Zrillic*, 563 So. 2d 64, 66–67 (Fla. 1990).

141.   The constitutional right to property "includes the incidents of property ownership: the collection of rights to use and enjoy property, *including [the] right to transmit it to others.*" *Id.* at 67 (emphasis in original, internal quotations omitted). Simply put, "the right to devise property is a property right protected by the Florida Constitution"). *Id.*

142.   Defendant has intentionally violated the rights of President Trump and will continue to do so unless this Court intervenes.

WHEREFORE President Trump demands preliminary and permanent injunctive relief restraining James, her agents, servants, employees, and attorneys and all other persons in active concert or participation with her who receive actual notice of the injunction, from requesting, demanding, obtaining, possessing, or disclosing a copy of his revocable trust or the terms thereof, or of restraining Plaintiff's ability to amend, modify or revoke the Trust, and such other and further relief as the Court deems proper, including costs.

## COUNT III

**(Violation of Plaintiff President Donald J. Trump's Rights As Grantor and Beneficiary of the Donald J. Trump Revocable Trust)**

143.   President Trump re-alleges and incorporates by reference the allegations in paragraphs 1-97 above as if fully set forth herein.

144.   President Trump is both the settlor and a beneficiary of the Donald J. Trump Revocable Trust.

145.   As such, President Trump holds the power of designating the trustee of the Trust under both the express terms of the Trust and under the Florida Trust Code.

146.   President Trump also retains the right to amend, modify, or revoke the Trust.

147.   Defendant's conduct threatens to interfere with his lawfully protected right to the proper administration of the Trust by supplanting, controlling or monitoring the trustee and attempting to exercise or restrain the exercise of powers delegated by President Trump to the trustee or belonging to him alone.

148.   President Trump requires a declaration concerning the rights of his trustee to control the Trust free from interference by James.

149.   President Trump seeks injunctive relief to prevent Defendant's future attempts to unlawfully supplant the trustee or exercise powers held by the trustee in any manner, either personally or through an agent.

WHEREFORE President Trump demands preliminary and permanent injunctive relief restraining James, her agents, servants, employees, and

attorneys and all other persons in active concert or participation with her who receive actual notice of the injunction, (i) from requesting, demanding, obtaining, possessing, or disclosing a copy of his revocable trust or the terms thereof, (ii) from exercising any authority or oversight or restraint on his revocable trust or ability to revoke it, as well as declaratory relief that James has no authority to supplant or control the powers of the trustee of such a trust, and (iii) and such other and further relief as the Court deems proper, including costs.

Dated this 15th day of November, 2022.

**WEBER, CRABB & WEIN, P.A.**

*/s/ Timothy W. Weber*
Timothy W. Weber, Esq.
FBN: 86789
timothy.weber@webercrabb.com
lisa.willis@webercrabb.com
Jeremy D. Bailie, Esq.
FBN: 118558
jeremy.bailie@webercrabb.com
carol.sweeney@webercrabb.com
R. Quincy Bird, Esq.
FBN: 105746
Quincy.Bird@webercrabb.com
honey.rechtin@webercrabb.com
5453 Central Avenue
St. Petersburg, Florida 33710
(t): 727-828-9919
(f): 727-828-9924
*Attorneys for President Trump*

Case 9:22-cv-81780-DMM   Document 1-1   Entered on FLSD Docket 11/16/2022   Page 93 of 126

| From: | Faherty, Colleen |
|---|---|
| To: | Amy Carlin; Lawrence Rosen |
| Cc: | Wallace, Kevin; Finkelstein, Alex; Haren, Eric |
| Subject: | People v. The trump organization |
| Date: | Wednesday, August 31, 2022 6:12:57 PM |

**EXHIBIT**

**A**

Hi Amy and Larry,

We're writing concerning the production of certain documents. After reviewing our records, it appears that TTO has not produced a full set of documents governing Mr. Trump's revocable trust, including any formation documents, amendments to the trust, or other agreements governing the trust's operation. The relevant production, regarding restructuring (from 3/11/22), doesn't seem to have those documents, at least not a full set. Can TTO please produce a set of those documents by the end of this week? (Or, if we are mistaken, and these have been produced, we would appreciate your alerting us to the pertinent Bates numbers).

Related to this issue, we have seen some indication that the trust now is a "Florida grantor trust." See, e.g., TTO_02355681. We are unsure if any document governing the trust has changed that would reflect such a change, but if there has been such a change, please let us know.

We appreciate your prompt attention to these matters. Hope all else is otherwise well.

Best,
Colleen


Get Outlook for iOS

Case 9:22-cv-81780-DMM Document 1-1 Entered on FLSD Docket 11/16/2022 Page 94 of 126

| From: | Alina Habba, Esq. |
| To: | Faherty, Colleen; Wallace, Kevin; Lawrence Rosen; Amy Carlin; Michael Madaio; Finkelstein, Alex; Randee Ingram |
| Subject: | Re: Meet and Confer Request |
| Date: | Friday, September 16, 2022 10:35:56 AM |
| Attachments: | image001.png |

Good morning-

I am working with the attorneys to get you your request without disclosing estate planning information.

Thank you,

Alina Habba, Esq.
Habba Madaio & Associates LLP

---

**From:** Faherty, Colleen<Colleen.Faherty@ag.ny.gov>
**Sent:** Friday, September 16, 2022 8:08 AM
**To:** Alina Habba, Esq.<ahabba@habbalaw.com>;Wallace, Kevin<Kevin.Wallace@ag.ry.gov>;
Lawrence Rosen<rosen@hrgb.com>;Amy Carlin<ACarlin@hrgb.com>;Michael Madaio
<mmadaio@habbalaw.com>;Finkelstein, Alex<Alex.Finkelstein@ag.ny.gov>;Randee Ingram
<ingram@habbalaw.com>
**Subject:** RE: Meet and Confer Request

Dear Alina, et al.,

Following up on the below thread regarding the trust documents. Please confirm whether you intend to produce the documents requested.

Additionally, we have noticed an error with certain documents in the production. In particular, we have received documents that were sent password protected in their original transmission, but once produced to OAG, remained password protected and inaccessible. (see, e.g. TTO_198993). I can ask our IT folks to give you a better overview of the documents identified, but want to flag for you in case your IT team has a quick remedy for this. Please let me know.

Thank you.

Best,
Colleen

---

**Colleen K. Faherty | Assistant Attorney General**
Executive Division – Federal Initiatives
New York State Office of the Attorney General
28 Liberty Street, 18th floor | New York, NY 10005
Tel: 212.416.6046 | Fax: 212.416.6009

Colleen.Faherty@ag.ny.gov

---

**From:** Faherty, Colleen
**Sent:** Thursday, September 8, 2022 3:38 PM
**To:** Alina Habba, Esq. <ahabba@habbalaw.com>; Wallace, Kevin <kevin.Wallace@ag.ny.gov>; Lawrence Rosen <lrosen@lhrgb.com>; Amy Carlin <ACarlin@lhrgb.com>; Michael Madaio <mmadaio@habbalaw.com>; Finkelstein, Alex <Alex.Finkelstein@ag.ny.gov>; Randee Ingram <ringram@habbalaw.com>
**Subject:** RE: Meet and Confer Request

Alina,

Thank you for providing this document; however, I'm afraid this doesn't sufficiently address our request because it does not get at the trust as part of the operating business enterprise that is the Trump Organization. The Donald J. Trump Revocable Trust, in general, holds the entities and properties that comprise the Trump Organization. As a trust, its trustee or trustees are its responsible officials, and a trust typically is governed by the terms set by the grantor in the grant or otherwise later agreed to. Since the trust's business assets have been included within the trust for more than five years, all documents governing the trust's operation, the responsibilities of its trustees and other officials, etc., plainly are pertinent to OAG's investigation. There is no basis to withhold any such documents from production.

Below is an itemized list of the excerpted trust documents we believe we have received. I can't say this is a complete list, but these documents while relevant also do not fully address our request because many are incomplete on their face and we have no assurance that other agreements, amendments, etc., do not exist:

- We have received an excerpted trust document, with only pages 1 and 46 included. The rest of the pages are not included. TTO02922134.
- We have received portions of a second amendment to the trust. TTO03451963. It does not appear we have received the full second amendment, nor have we received any first amendment that preceded it.
- As part of a March 11, 2022 production of a closing binder for the late 2016/early 2017 restructuring with numbered files, we received a third amendment. TTO05698935. We do not know if there were subsequent amendments.
- As part of that same closing-binder production, we received a document appearing to be a set of trust instructions. TTO05698019. We do not know if this is the only set of instructions, or if there are later sets of instructions or other arrangements or agreements that would govern operation of the trust.

We appreciate your working with us, but are constrained to restate our request for the documents establishing the Donald J. Trump Revocable Trust dated April 7, 2014, any amendments thereto, and any document reflecting a change in the status of that Trust to "a Florida grantor trust". For the avoidance of doubt, the request includes any formation documents, amendments to the trust, or

other documents governing the trust's operation. We do not understand how production of this set of documents could be difficult or time consuming. We ask for production by the end of this week.

Thank you.

Best,
Colleen

**Colleen K. Faherty | Assistant Attorney General**
Executive Division – Federal Initiatives
New York State Office of the Attorney General
28 Liberty Street, 18th floor | New York, NY 10005
Tel: 212.416.6046 | Fax: 212.416.6009
Colleen.Faherty@ag.ny.gov

**From:** Alina Habba, Esq. ahabba@habbalaw.com
**Sent:** Wednesday, September 2AM
**To:** Faherty Coleen < ColeenFaherty@ny.gov > Wallace Kevin < KevWallace@ny.gov >;
Lawrence Rosen < lrosen@lrb.com >; Amy Carlin < ACarlin@lrb.com >; Michael Madaio
< mmadaio@habbalaw.com >; Finkelstein, Alex < AlexFinkelstein@ny.gov >; Bandele Ingram
< ingram@habbalaw.com >
**Subject:** Meeting Confer Request

Coleen,

In response to your request I am able to provide to **confidential** documents in addition to those
that T T Ohain the possession and previously produce to the OAG. As per my call to Kevin and
Coleen yesterday be leave these documents should include all information the OAG is seeking or
would require, as is relevant to this investigation without divulging any of the highly sensitive estate
planning information which would be obvious objected to.

Please let me know if can be of any further assistance.

Very truly yours,

Alina Habba, Esq
Habba Madaio & Associates LP



**ALINA HABBA, ESQ.**

*Admitted to Practice in NJ, NY & CT*

HABBA MADAIO
& Associates LLP

1430 US Highway 206, Suite 240

Bedminster, New Jersey 07921

Telephone: 908-869-1188

Facsimile: 908-450-1881

The information in this e-mail is confidential and may be legally privileged. If you are not the intended recipient, you must not read, use or disseminate the information. Although this e-mail and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Habba Madaio & Associates LLP for any loss or damage arising in any way from its use.

**From:** Faherty, Colleen <colleen.Faherty@ag.ny.gov>

**Sent:** Thursday, September 1, 2022 1:45PM

**To:** Alina Habba, Esq. <ahabba@habbalaw.com>; Wallace, Kevin <kevin.Wallace@ag.ny.gov> Lawrence Rosen <lrosen@hrgb.co>; Amy Carlin <ACarlin@hrgb.co>; Michael Madaio <mmadaio@habbalaw.co>; Firkelstein, Alex <Alex.Firkelstein@ag.ny>; Peter Gabra <pgabra@habbalaw.co>; Randee Ingram <ingram@habbalaw.com>

**Subject:** RE: Meet and Confer Request

Hi Alina –

Given the extensive litigation over productions to date, we think it is best to communicate in so please consider this email our meet and confer.

The request is for the documents establishing the Donald J. Trump Revocable Trust dated A 2014 and any document reflecting a change in the status of that Trust to "a Florida grantor tr shown in the attached document. For the avoidance of doubt, the request includes any form documents, amendments to the trust, or other documents governing the trust's operation. W expect these documents will be straightforward to obtain and produce.

As the Trust holds all of the assets valued in the SOFC's and its Trustees are responsible for presentation of the statements from 2016 forward, these are basic, foundational documents, b have not been able to identify them (or complete versions of them) in the productions to dat TTO can identify the relevant bates numbers, great. If not, we would like them produced ASA decline, we would like to know ASAP. (But we will add that these documents are properly call

by a number of subpoenas)

Much appreciated

Best,
Coleen

---

**Colleen K. Faherty | Assistant Attorney General**
Executive Division – Federal Initiatives
New York State Office of the Attorney General
28 Liberty Street, 18th floor | New York, NY 10005
Tel: 212.416.6046 | Fax: 212.416.6009
Colleen.Faherty@ag.ny.gov

**From:** Alina Habba, Esq     ahabba@habbalaw.com>
**Sent:** Thursday, September 07
**To:** Faherty, Coleen <Coleen.Faherty@ag.ny.gov> Wallace, Kevin < Kevin.Wallace@ag.ny.gov >
Lawrence Rosen < lrosen@rc.com > Amy Carlin < A.carlin@rc.com > Nathan Maio
< nmaio@habbalaw.com > Finkelstein, Alex < Alex.Finkelstein@ag.ny.gov > Peter Gabra
gabra@habbalaw.com     Pam Delgram < nirgam@habbalaw.com >
**Subject:** Meet and Confer Request

[EXTERNAL]

Good morning

I understand a request was made for additional documents yesterday regarding the trust. Please provide me with some times that work tomorrow for a meet and confer so I can assist with this and take a look at what has been provided historically by T to you.

Thank you,

Alina Habba, Esq
Habba Maio & Associates LLP

**IMPORTANT NOTICE:** This e-mail, including any attachments, may become confidential, privileged or otherwise legally protected and is intended only for the addressee. If you received this e-mail in error or from someone who was not authorized to send it to you, do not disseminate, copy or otherwise use this e-mail or its attachments. Please notify the sender immediately by e-mail and delete the e-mail from your system.



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL
28 LIBERTY STREET
NEW YORK, NY 10005

LETITIA JAMES
ATTORNEY GENERAL

November 3, 2022

Hon. Arthur Engoron
Supreme Court, New York County
60 Centre Street
New York, NY 10007

　　　　RE:　　People v. Donald J. Trump, et al. – Index No. 452564/2022

Dear Justice Engoron,

　　　　The Office of the Attorney General ("OAG") writes in advance of this morning's hearing to alert the Court to an important and highly relevant development. According to a social media post last night, Mr. Trump has filed suit against the New York Attorney General in a Florida state court seeking, again, to frustrate OAG's investigation and this enforcement action ("Florida Compl.").[1]

　　　　This development puts beyond doubt that preliminary relief is warranted here for a few reasons. *First*, Mr. Trump is, in fact, attempting to shield the key documents governing the structure of his business conglomerate and ownership of his business assets from review. In particular, Mr. Trump asserts a legal right to shield from scrutiny the documents governing the Donald J. Trump Revocable Trust (the "Trust"), *see, e.g.*, Florida Compl. ¶ 118, despite, as this Court knows, having consented to this Court's jurisdiction over investigative subpoena enforcement. These documents are of obvious relevance; not only do they pertain to the merits, but they also pertain to ownership and control of the business assets and thus to available relief.[2]

---

[1] Attached is a copy of the complaint that purports to have been filed in the Circuit Court of the Fifteenth Judicial District in Palm Beach County, Civil Division.

[2] As has been noted, the Trust is the vehicle through which the Statements of Financial Condition were issued in many recent years; the trustees of that trust signed key letters and documents pertaining to the statements; and the trust, as a general matter, is the legal owner of the business entities that constitute the assets of the Trump Organization. *See, e.g.*, OAG Verified Complaint at ¶ 30.

EXHIBIT
B

November 3, 2022
Page 2

*Second*, Mr. Trump admits he is seeking to put assets beyond this Court's reach. The purported suit seeks a declaration that OAG "has no jurisdiction over the assets of a Florida trust." *Id.* (text before Count II).

*Third*, Mr. Trump states he is a resident of Palm Beach, Florida. *Id.* ¶ 1. Although OAG has not sought attachment here, as OAG's reply papers articulated, one circumstance where the Legislature has articulated attachment is appropriate is when "the defendant is a nondomiciliary residing without the state." *See, e.g.*, C.P.L.R. 6201(1). Mr. Trump has thus admitted facts that would support the relief of attachment—and thus also support the more modest relief sought here.

*Fourth*, the Florida suit attempts to dispute the effective service of all defendants in this action by asserting—in a footnote—that OAG "failed to sue the trustee in his capacity as such," in this case. Florida Compl., fn. 1. All defendants have been properly served in this action. *See* Certificates of Service, NYSCEF Nos. 36 (including certification of service on Donald Trump, Jr. and the Trust by service upon Donald Trump, Jr.'s counsel, Alan Futerfas), 120. It is baseless to insist that the Trust has not been served in this case when the Complaint is plainly clear that Donald Trump, Jr. is sued in both his capacity as a Trump Organization executive (*see, e.g.*, OAG Verified Complaint at ¶ 32), as well as the trustee of the Trust (*see, e.g. id.* at ¶¶ 6, 38, 551, 727, 745, 758). The insistence that service has not been effected (and thus no jurisdiction would purportedly exist over the Trust) is only further evidence that the immediate relief OAG seeks is necessary to prevent responding Defendants from evading this Court's jurisdiction.

Respectfully submitted,

Kevin Wallace
Senior Enforcement Counsel
Division of Economic Justice

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA,
CIVIL DIVISION

PRESIDENT DONALD J. TRUMP,

        Plaintiff,                          Case No.: 22-CA-010792

v.

LETITIA JAMES, individually,

        Defendant.

_____/

### **PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE**

Plaintiff, PRESIDENT DONALD J. TRUMP, by and through his undersigned attorneys, hereby requests that this Court take judicial notice of the following:

1.    Letter from the Office of Letitia James, Attorney General to the Honorable Arthur Engoron dated November 3, 2022, filed in the Supreme Court of the State of New York County, New York, as docket entry 182 in *People of the State of New York, by Letitia James, Attorney General of the State of New York v. Trump, Index No. 452564/2022.*

2.    *Email conversation involving Colleen Faherty from the Office of Letitia James, Attorney General dated August 31, 2022,* filed in the Supreme Court of the State of New York County, New York, as docket entry 163 in *People of the State of New York, by Letitia James, Attorney General of the State of New*

*York v. Trump, Index No. 452564/2022.*

Dated this 15th day of November, 2022.

**WEBER, CRABB & WEIN, P.A.**

*/s/ Timothy W. Weber*

Timothy W. Weber, Esq.
FBN: 86789
timothy.weber@webercrabb.com
lisa.willis@webercrabb.com
Jeremy D. Bailie, Esq.
FBN: 118558
jeremy.bailie@webercrabb.com
carol.sweeney@webercrabb.com
R. Quincy Bird, Esq.
FBN: 105746
quincy.bird@webercrabb.com
honey.rechtin@webercrabb.com
5453 Central Avenue
St. Petersburg, Florida 33710
(t): 727-828-9919
(f): 727-828-9924
*Attorneys for President Trump*

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA,
CIVIL DIVISION

PRESIDENT DONALD J. TRUMP,

      Plaintiff,

v.

LETITIA JAMES, individually,

      Defendant.

_____/

Case No.: 22-CA-010792

## PLAINTIFF'S NOTICE OF FILING

Plaintiff, PRESIDENT DONALD J. TRUMP, by and through his undersigned attorneys, hereby gives notice of filing the following documents, which by this filing, will herewith become a part of the Court record:

1.    Letter from the Office of Letitia James, Attorney General to the Honorable Arthur Engoron dated November 3, 2022, filed in the Supreme Court of the State of New York County, New York, as docket entry 182 in *People of the State of New York, by Letitia James, Attorney General of the State of New York v. Trump, Index No. 452564/2022.*

2.    *Email conversation involving Colleen Faherty from the Office of Letitia James, Attorney General dated August 31, 2022,* filed in the Supreme Court of the State of New York County, New York, as docket entry 163 in *People of the State of New York, by Letitia James, Attorney General of the State of New*

*York v. Trump, Index No. 452564/2022.*

Dated this 15th day of November, 2022.

**WEBER, CRABB & WEIN, P.A.**

*/s/ Timothy W. Weber*

Timothy W. Weber, Esq.
FBN: 86789
timothy.weber@webercrabb.com
lisa.willis@webercrabb.com
Jeremy D. Bailie, Esq.
FBN: 118558
jeremy.bailie@webercrabb.com
carol.sweeney@webercrabb.com
R. Quincy Bird, Esq.
FBN: 105746
quincy.bird@webercrabb.com
honey.rechtin@webercrabb.com
5453 Central Avenue
St. Petersburg, Florida 33710
(t): 727-828-9919
(f): 727-828-9924
*Attorneys for President Trump*

NOT A CERTIFIED COPY

| From: | Faherty, Colleen |
|---|---|
| To: | Amy Carlin; Lawrence Rosen |
| Cc: | Wallace, Kevin; Finkelstein, Alex; Haren, Eric |
| Subject: | People v. The trump organization |
| Date: | Wednesday, August 31, 2022 6:12:57 PM |

Hi Amy and Larry,

We're writing concerning the production of certain documents. After reviewing our records, it appears that TTO has not produced a full set of documents governing Mr. Trump's revocable trust, including any formation documents, amendments to the trust, or other agreements governing the trust's operation. The relevant production, regarding restructuring (from 3/11/22), doesn't seem to have those documents, at least not a full set. Can TTO please produce a set of those documents by the end of this week? (Or, if we are mistaken, and these have been produced, we would appreciate your alerting us to the pertinent Bates numbers).

Related to this issue, we have seen some indication that the trust now is a "Florida grantor trust." See, e.g., TTO_02355681. We are unsure if any document governing the trust has changed that would reflect such a change, but if there has been such a change, please let us know.

We appreciate your prompt attention to these matters. Hope all else is otherwise well.

Best,
Colleen


Get Outlook for iOS

Case 9:22-cv-81780-DMM   Document 1-1   Entered on FLSD Docket 11/16/2022   Page 106 of
126

| From: | Alina Habba, Esq. |
|---|---|
| To: | Faherty, Colleen; Wallace, Kevin; Lawrence Rosen; Amy Carlin; Michael Madaio; Finkelstein, Alex; Randee Ingram |
| Subject: | Re: Meet and Confer Request |
| Date: | Friday, September 16, 2022 10:35:56 AM |
| Attachments: | image001.png |

Good morning-

I am working with the attorneys to get you your request without disclosing estate planning
information.

Thank you,

Alina Habba, Esq.
Habba Madaio & Associates LLP

---

**From:** Faherty, Colleen <Colleen.Faherty@ag.ny.gov>
**Sent:** Friday, September 16, 2022 8:03:08 AM
**To:** Alina Habba, Esq. <ahabba@habbalaw.com>; Wallace, Kevin <Kevin.Wallace@ag.ny.gov>;
Lawrence Rosen <lrosen@lhrgb.com>; Amy Carlin <ACarlin@lhrgb.com>; Michael Madaio
<mmadaio@habbalaw.com>; Finkelstein, Alex <Alex.Finkelstein@ag.ny.gov>; Randee Ingram
<ringram@habbalaw.com>
**Subject:** RE: Meet and Confer Request

Dear Alina, et al.,

Following up on the below thread regarding the trust documents. Please confirm whether you
intend to produce the documents requested.

Additionally, we have noticed an error with certain documents in the productions. In particular we
have received documents that were sent password protected in their original transmission, but that
once produced to OAG, remained password protected and inaccessible. (see, e.g. TTO_06198993). I
can ask our IT folks to give you a better overview of the documents identified, but want to flag it for
you in case your IT team has a quick remedy for this. Please let me know.

Thank you.

Best,
Colleen

---

**Colleen K. Faherty | Assistant Attorney General**
Executive Division – Federal Initiatives
New York State Office of the Attorney General
28 Liberty Street, 18th floor | New York, NY 10005
Tel: 212.416.6046 | Fax: 212.416.6009

Case 9:22-cv-81780-DMM Document 1-1 Entered on FLSD Docket 11/16/2022 Page 107 of 126

Colleen.Faherty@ag.ny.gov

**From:** Faherty, Colleen
**Sent:** Thursday, September 8, 2022 3:38 PM
**To:** Alina Habba, Esq. <ahabba@habbalaw.com>; Wallace, Kevin <Kevin.Wallace@ag.ny.gov>; Lawrence Rosen <lrosen@lhrgb.com>; Amy Carlin <ACarlin@lhrgb.com>; Michael Madaio <mmadaio@habbalaw.com>; Finkelstein, Alex <Alex.Finkelstein@ag.ny.gov>; Randee Ingram <ringram@habbalaw.com>
**Subject:** RE: Meet and Confer Request

Alina,

Thank you for providing this document; however, I'm afraid this doesn't sufficiently address our request because it does not get at the trust as part of the operating business enterprise that is the Trump Organization. The Donald J. Trump Revocable Trust, in general, holds the entities and properties that comprise the Trump Organization. As a trust, its trustee or trustees are its responsible officials, and a trust typically is governed by the terms set by the grantor in the grant or otherwise later agreed to. Since the trust's business assets have been included within the trust for more than five years, all documents governing the trust's operation, the responsibilities of its trustees and other officials, etc., plainly are pertinent to OAG's investigation. There is no basis to withhold any such documents from production.

Below is an itemized list of the excerpted trust documents we believe we have received. I can't say this is a complete list, but these documents while relevant also do not fully address our request because many are incomplete on their face and we have no assurance that other agreements, amendments, etc., do not exist:

- We have received an excerpted trust document, with only pages 1 and 46 included. The rest of the pages are not included. TTO_02922134.
- We have received portions of a second amendment to the trust. TTO_03451963. It does not appear we have received the full second amendment, nor have we received any first amendment that preceded it.
- As part of a March 11, 2022 production of a closing binder for the late 2016/early 2017 restructuring with numbered files, we received a third amendment. TTO_05698935. We do not know if there were subsequent amendments.
- As part of that same closing-binder production, we received a document appearing to be a set of trust instructions. TTO_05698019. We do not know if this is the only set of instructions, or if there are later sets of instructions or other arrangements or agreements that would govern operation of the trust.

We appreciate your working with us, but are constrained to restate our request for the documents establishing the Donald J. Trump Revocable Trust dated April 7, 2014, any amendments thereto, and any document reflecting a change in the status of that Trust to "a Florida grantor trust". For the avoidance of doubt, the request includes any formation documents, amendments to the trust, or

other documents governing the trust's operation. We do not understand how a production of this set of documents could be difficult or time-consuming. We ask for production by the end of this week.

Thank you.

Best,
Colleen

---

**Colleen K. Faherty | Assistant Attorney General**
Executive Division – Federal Initiatives
New York State Office of the Attorney General
28 Liberty Street, 18th floor | New York, NY 10005
Tel: 212.416.6046 | Fax: 212.416.6009
Colleen.Faherty@ag.ny.gov

---

**From:** Alina Habba, Esq. <ahabba@habbalaw.com>
**Sent:** Wednesday, September 7, 2022 3:44 PM
**To:** Faherty, Colleen <Colleen.Faherty@ag.ny.gov>; Wallace, Kevin <Kevin.Wallace@ag.ny.gov>; Lawrence Rosen <lrosen@lhrgb.com>; Amy Carlin <ACarlin@lhrgb.com>; Michael Madaio <mmadaio@habbalaw.com>; Finkelstein, Alex <Alex.Finkelstein@ag.ny.gov>; Randee Ingram <ringram@habbalaw.com>
**Subject:** RE: Meet and Confer Request

Hi Colleen,

In response to your request I am able to provide two **confidential** documents in addition to those that TTO had in their possession and previously produced to the OAG. As per my call with Kevin and Colleen yesterday, I believe these documents should include all information the OAG is seeking or would require, as is relevant to this investigation, without divulging any of the highly-sensitive estate planning information which we would obviously object to.

Please let me know if I can be of any further assistance.

Very truly yours,

Alina Habba, Esq.
Habba Madaio & Associates LLP

NOT A CERTIFIED COPY

Case 9:22-cv-81780-DMM   Document 1-1   Entered on FLSD Docket 11/16/2022   Page 109 of 126



**ALINA HABBA, ESQ.**

*Admitted to Practice in NJ, NY & CT*

**HABBA MADAIO**
& Associates LLP

1430 US Highway 206, Suite 240

Bedminster, New Jersey 07921

Telephone: 908-869-1188

Facsimile: 908-450-1881

The information in this e-mail is confidential and may be legally privileged. If you are not the intended recipient, you must not read, use or disseminate the information. Although this e-mail and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Habba Madaio & Associates LLP for any loss or damage arising in any way from its use.

**From:** Faherty, Colleen <Colleen.Faherty@ag.ny.gov>
**Sent:** Thursday, September 1, 2022 1:45 PM
**To:** Alina Habba, Esq. <ahabba@habbalaw.com>; Wallace, Kevin <Kevin.Wallace@ag.ny.gov>; Lawrence Rosen <lrosen@lhrgb.com>; Amy Carlin <ACarlin@lhrgb.com>; Michael Madaio <mmadaio@habbalaw.com>; Finkelstein, Alex <Alex.Finkelstein@ag.ny.gov>; Peter Gabra <pgabra@habbalaw.com>; Randee Ingram <ringram@habbalaw.com>
**Subject:** RE: Meet and Confer Request

Hi Alina –

Given the extensive litigation over productions to date, we think it is best to communicate in writing, so please consider this email our meet and confer.

The request is for the documents establishing the Donald J. Trump Revocable Trust dated April 7, 2014 and any document reflecting a change in the status of that Trust to "a Florida grantor trust" as shown in the attached document. For the avoidance of doubt, the request includes any formation documents, amendments to the trust, or other documents governing the trust's operation. We expect these documents will be straightforward to obtain and produce.

As the Trust holds all of the assets valued in the SOFC's and its Trustees are responsible for the presentation of the statements from 2016 forward, these are basic, foundational documents, but we have not been able to identify them (or complete versions of them) in the productions to date. If TTO can identify the relevant bates numbers, great. If not, we would like them produced ASAP. If you decline, we would like to know ASAP. (But we will add that these documents are properly called for

by a number of subpoenas.)

Much appreciated.

Best,
Colleen

**Colleen K. Faherty | Assistant Attorney General**
Executive Division – Federal Initiatives
New York State Office of the Attorney General
28 Liberty Street, 18th floor | New York, NY 10005
Tel: 212.416.6046 | Fax: 212.416.6009
Colleen.Faherty@ag.ny.gov

**From:** Alina Habba, Esq. <ahabba@habbalaw.com>
**Sent:** Thursday, September 1, 2022 12:17 PM
**To:** Faherty, Colleen <Colleen.Faherty@ag.ny.gov>; Wallace, Kevin <Kevin.Wallace@ag.ny.gov>;
Lawrence Rosen <lrosen@lhrgb.com>; Amy Carlin <ACarlin@lhrgb.com>; Michael Madaio
<mmadaio@habbalaw.com>; Finkelstein, Alex <Alex.Finkelstein@ag.ny.gov>; Peter Gabra
<pgabra@habbalaw.com>; Randee Ingram <ringram@habbalaw.com>
**Subject:** Meet and Confer Request

[EXTERNAL]
Good morning,

I understand a request was made for additional documents yesterday regarding the trust. Please
provide me with some times that work tomorrow for a meet and confer so I can assist with this and
take a look at what has been provided historically by TTO for you.

Thank you,

Alina Habba, Esq.
Habba Madaio & Associates LLP

**IMPORTANT NOTICE:** This e-mail, including any attachments, may be confidential, privileged or
otherwise legally protected. It is intended only for the addressee. If you received this e-mail in error
or from someone who was not authorized to send it to you, do not disseminate, copy or otherwise
use this e-mail or its attachments. Please notify the sender immediately by reply e-mail and delete
the e-mail from your system.



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL
28 LIBERTY STREET
NEW YORK, NY 10005

LETITIA JAMES
ATTORNEY GENERAL

November 3, 2022

Hon. Arthur Engoron
Supreme Court, New York County
60 Centre Street
New York, NY 10007

   RE: People v. Donald J. Trump, et al. – Index No. 452564/2022

Dear Justice Engoron,

   The Office of the Attorney General ("OAG") writes in advance of this morning's hearing to alert the Court to an important and highly relevant development. According to a social media post last night, Mr. Trump has filed suit against the New York Attorney General in a Florida state court seeking, again, to frustrate OAG's investigation and this enforcement action ("Florida Compl.").[1]

   This development puts beyond doubt that preliminary relief is warranted here for a few reasons. *First*, Mr. Trump is, in fact, attempting to shield the key documents governing the structure of his business conglomerate and ownership of his business assets from review. In particular, Mr. Trump asserts a legal right to shield from scrutiny the documents governing the Donald J. Trump Revocable Trust (the "Trust"), *see, e.g.*, Florida Compl. ¶ 118, despite, as this Court knows, having consented to this Court's jurisdiction over investigative subpoena enforcement. These documents are of obvious relevance; not only do they pertain to the merits, but they also pertain to ownership and control of the business assets and thus to available relief.[2]

---

[1] Attached is a copy of the complaint that purports to have been filed in the Circuit Court of the Fifteenth Judicial District in Palm Beach County, Civil Division.

[2] As has been noted, the Trust is the vehicle through which the Statements of Financial Condition were issued in many recent years; the trustees of that trust signed key letters and documents pertaining to the statements; and the trust, as a general matter, is the legal owner of the business entities that constitute the assets of the Trump Organization. *See, e.g.*, OAG Verified Complaint at ¶ 30.

November 3, 2022
Page 2

*Second*, Mr. Trump admits he is seeking to put assets beyond this Court's reach. The purported suit seeks a declaration that OAG "has no jurisdiction over the assets of a Florida trust." *Id.* (text before Count II).

*Third*, Mr. Trump states he is a resident of Palm Beach, Florida. *Id.* ¶ 1. Although OAG has not sought attachment here, as OAG's reply papers articulated, one circumstance where the Legislature has articulated attachment is appropriate is when "the defendant is a nondomiciliary residing without the state." *See, e.g.*, C.P.L.R. 6201(1). Mr. Trump has thus admitted facts that would support the relief of attachment—and thus also support the more modest relief sought here.

*Fourth*, the Florida suit attempts to dispute the effective service of all defendants in this action by asserting—in a footnote—that OAG "failed to sue the trustee in his capacity as such," in this case. Florida Compl., fn. 1. All defendants have been properly served in this action. *See* Certificates of Service, NYSCEF Nos. 36 (including certification of service on Donald Trump, Jr. and the Trust by service upon Donald Trump, Jr.'s counsel, Alan Futerfas), 120. It is baseless to insist that the Trust has not been served in this case when the Complaint is plainly clear that Donald Trump, Jr. is sued in both his capacity as a Trump Organization executive (*see, e.g.*, OAG Verified Complaint at ¶ 32), as well as the trustee of the Trust (*see, e.g. id.* at ¶¶ 6, 38, 551, 727, 745, 758). The insistence that service has not been effected (and thus no jurisdiction would purportedly exist over the Trust) is only further evidence that the immediate relief OAG seeks is necessary to prevent responding Defendants from evading this Court's jurisdiction.

Respectfully submitted,

Kevin Wallace
Senior Enforcement Counsel
Division of Economic Justice

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA,
CIVIL DIVISION

PRESIDENT DONALD J. TRUMP,

      Plaintiff,                               Case No.: 22-CA-010792

v.

LETITIA JAMES, individually,

      Defendant.

_____/

## PRESIDENT TRUMP'S EMERGENCY
## MOTION FOR TEMPORARY INJUNCTION

Plaintiff, PRESIDENT DONALD J. TRUMP ("President Trump"), by and through his undersigned attorneys and pursuant to Fla. R. Civ. P. 1.610(a)(1), moves this Court for a temporary injunction against Defendant, LETITIA JAMES ("James"), prohibiting James, either personally, through an agent or through any other persons acting in active concert or participation with her, from requesting, demanding, obtaining, possessing or disclosing the 2020 or 2022 amendments of the Donald J. Trump Revocable Trust (the "Trust"), a Florida revocable trust.

### Basis for Emergency Relief

President Trump requires emergent consideration of this Motion as James seeks to invade President Trump's privacy for the purpose of embarrassing and harassing him and revealing matters over which he possesses a clearly established constitutional right of privacy – the terms of the revocable trust that reveal his

private desires regarding the disposition of his assets.

## Facts

1.     As outlined in the Amended Complaint, James has engaged in a broad attack on President Trump, as well as his children, business associates, executive employees, and business enterprises ("Related Parties").

2.     These attacks have been in the form of investigative subpoenas for testimony and documents, lawsuits, referrals of President Trump and Related Parties to other agencies with criminal or regulatory investigatory authority, and defamatory statements.

3.     According to a Verified Complaint filed by James in New York, she and her assistants have interviewed more than 65 witnesses and reviewed millions of pages of documents produced by President Trump, the Related Parties, or others. *See People of the State of New York, et al. v. Donald J. Trump, et al,* Index No. 452564/2022 (the "Civil Action"). The Court can take judicial notice of the Verified Complaint filed by James against President Trump and the Related Parties, among others.

4.     James is neither a trustee nor a beneficiary of the revocable trust.

5.     Recently, James has demanded copies of President Trump's revocable trust instrument (see Exhibit A to Amended Complaint) with only vague and pretextual explanations offered concerning why she would possibly need this information. President Trump reasonably believes that James will attempt to use

her position as Attorney General to obtain these documents for the purpose of embarrassing President Trump and revealing their contents.

6.     In fact, after becoming aware of the filing of this action for an injunction to restrain her from obtaining the revocable trust documents, James immediately attempted to obtain it. On November 3, 2022, the day after this suit was filed, James, through a subordinate, filed a letter (the "November 3 Letter") in the Civil Action addressed to the New York Judge pointing out the instant lawsuit and wrongfully asserting that the revocable trust and all amendments to it were "key documents" that are "obviously relevant" to the Civil Action.

7.     These statements by James were knowingly false as a person's intended disposition of their assets in a trust that can be revoked at any time could never be relevant to a legal proceeding during their lifetime, something any trained lawyer, and certainly a State Attorney General, should appreciate.

8.     The November 3 Letter also falsely claimed that by initiating this action President Trump was attempting to "put assets beyond the reach" of the State of New York. Again, James' claims were knowingly false and outrageous since James sued the corporate entities owned by the revocable trust which in turn have legal title to the immovable real estate in New York City, and elsewhere, worth multiples of what James is seeking in the Civil Action.

9.     Despite James' pretexts for invading President Trump's private information, and false allegations in pursuit of that effort, this motion seeks

modest temporary injunctive relief to which any Florida citizen should be entitled – protection of his personal estate plan from disclosure to government officials intent on invading his constitutional right to privacy.

10.     The November 3 Letter is a clear indication that James will continue to use her position to request, demand, obtain, possess, and eventually leak a copy of President Trump's private revocable trust at the soonest opportunity. This is precisely why temporary injunctive relief is imperative to protect the confidential estate plan of a Florida citizen from being placed in the hands of a person intent on abusing her public position for personal and political gain.

11.     The public interest demands such action, and there can be no harm to James, or any other person, from the granting of such relief. However, privacy, once lost, is irreparable. Furthermore, the damages flowing from its invasion are difficult to fully ascertain such that the remedy at law is not adequate.

### Memorandum of Law

#### *Privacy*

The United States Supreme Court has held that the "established method of substantive-due-process analysis" requires that an un-enumerated but fundamental right be "'deeply rooted in this Nation's history and tradition'" before it can be recognized as a component of the "liberty" protected in the Due Process Clause. *Dobbs v. Jackson Women's Health Org.*, 213 L. Ed. 2d 545, 142 S.Ct. 2228 (2022). Among the fundamental rights the Court has recognized is

the right to privacy. *Id.*; *see also Griswold v. Connecticut*, 381 U.S. 479, 483 (1965) (acknowledging the First Amendment "has a penumbra where privacy is protected from governmental intrusion"). The Court has found "the cases sometimes characterized as protecting 'privacy' have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589, 598–600 (1977) (collecting cases).

Florida's constitutional right to privacy is even more robust than the privacy rights protected by the United States Constitution and "includes a fundamental right to the sole control of one's person, which covers an individual's control over or the autonomy of the intimacies of personal identity and a physical and psychological zone within which an individual has the right to be free from intrusion or coercion, whether by government or by society at large." *Green v. Alachua Cnty.,* 323 So. 3d 246 (Fla. 1st DCA 2021), *reh'g denied* (July 16, 2021) (citing Fla. Const. Art. 1, § 23) (emphasis supplied). Florida's constitutional privacy right embraces both *more* privacy interests and extends *more protection* to individuals in their private interests than does the U.S. Constitution. *Board of County Com'rs of Palm Beach County v. D.B.*, 784 So.2d 585 (Fla. 4th DCA 2001), *rev. denied* 807 So.2d 653. In Florida, the constitutional right of privacy ensures that individuals are able to determine for themselves

5

when, how, and to what extent information about them is communicated to others. *Weaver v. Myers*, 229 So.3d 1118 (Fla. 2017).  In short, it includes the right to be let alone.

When analyzing government action that infringes on the fundamental right of privacy, the applicable standard of review requires that the action survive *the highest level of scrutiny*, under which the presumption favors the individual and the state bears the burden of demonstrating that the breach of privacy serves a compelling state interest and accomplishes its goal through the use of the least intrusive means. *See Von Eiff v. Azicri*, 720 So.2d 510 (1998).

It is axiomatic that the right to privacy, once violated, results in irreparable harm. "Chilled free speech and invasions of privacy, because of their intangible nature, [can]not be compensated for by monetary damages; in other words, plaintiff [can]not be made whole." *Ne. Florida Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990); *Graham v. Dacheikh*, 991 So. 2d 932, 933 (Fla. 2d DCA 2008) (disclosure of private information constitutes irreparable injury).

### *A Florida Revocable Trust*

The privacy protection of estate planning documents is even more robust than other financial information. *Compton v. West Volusia Hosp. Authority*, 727 So. 2d 379, 382 (Fla. 5th DCA 1999) (a living person's will "is a document entitled to as much, if not more, constitutional protection" than those relating to personal

finances and income). Under Florida law, a revocable trust is often viewed as a "will substitute." See § 736.0601, Fla. Stat. ("The capacity required to create, amend, revoke, or add property to a revocable trust, or to direct the actions of the trustee of a revocable trust, is the same as that required to make a will.")

In *Compton,* the appellate court rejected attempted discovery of a party's will because it was simply impossible for such a document—which pertains to future events—to be relevant in a civil case. It found:

> A will speaks to events in the future—what disposition should be made of properties the testatrix may own, in the future, at the time of death. **It truly has no operable present effect** on assets currently owned, and it can be changed, revoked or destroyed at any time in the future, prior to the testatrix' death or loss of competence.

*Id.* at 381-82 (emphasis supplied).

Another reason trust instruments are provided such privacy protection is because "a living trust document involves the disposition of property at death, and consequently requires legal expertise." *The Florida Bar re Advisory Opinion—Nonlawyer Preparation of Living Trusts,* 613 So.2d 426, 428 (Fla. 1992). They are, therefore, "as privileged as any other attorney-client communication." *Compton*, 727 So. 2d. at 382. Consequently, confidential trust instruments fall under Florida's attorney-client privilege statute, § 90.502, Fla. Stat., which provides, in relevant part:

> A client has a privilege to refuse to disclose, and to prevent any other person from disclosing, the contents of confidential communications

> when such other person learned of the communications because they
> were made in the rendition of legal services to the client.

*Id.*

This is likewise why Florida's Land Trust Act permits individuals to convey real estate to trusts without recording or making public the terms of the trust, recognizing that most trustors would prefer to keep such matters confidential. *See* § 689.071(3), Fla. Stat. (2022) (permitting third parties to rely on trustee without inquiry into trustee's authority under the trust document). The beneficiaries of a trust have no personal liability for actions of the trustee, § 689.071(8), Fla. Stat. (2022) (beneficiaries of land trust not liable for debt of the trust), so their identity and interest in the trust are wholly irrelevant to any person claiming to be a creditor of the trust. Moreover, in a revocable trust, the trustee may follow the direction of the settlor, even if it is contrary to the trust instrument. § 736.0603, Fla. Stat. (2022). There truly can be no imaginable circumstance under which ANY governmental authority OR creditor would need to see the terms of a revocable trust during the lifetime of a grantor. Such trusts are formed to hold assets and dispose of them on the death of the settlor.

### Injunctive Relief Sought

There can be little doubt that President Trump has an expectation of privacy in the terms of his revocable trust and that society would recognize such expectation as reasonable. To allow James to obtain such information against

his will, whether through the machinery of her office or otherwise, would plainly be an invasion of the privacy President Trump does enjoy and would result in immediate, irreparable injury.

Although James's unlawful conduct possesses the color of law due to her status as the chief legal officer of the State of New York, this case concerns James' individual actions. As set forth in the Amended Complaint, James has acted contrary to law and decency in waging a personal war against President Trump and his children, business associates, employees, and "anyone in his orbit," leaving no doubt that she will act improperly if not restrained from invading President Trump's privacy.

In order to obtain temporary injunctive relief, the party requesting such relief must show: (i) irreparable harm, (iii) an inadequate remedy at law, (iii) a likelihood of success on the merits; and (iv) that entry of a temporary injunction serves the public interest. *See Donoho v. Allen-Rosner*, 254 So.3d 472 (Fla. 4th DCA 2018). Each factor is addressed below and clearly favors President Trump.

A. **Failure to Enter a Temporary Injunction Will Result in Irreparable Harm**

The Former Fifth Circuit recognized that "when a legitimate expectation of privacy exists, violation of privacy is harmful without any concrete consequential damages. Privacy of personal matters is an interest in and of itself, protected constitutionally . . . and at common law." *Plante*, 575 F.2d at

1135. The Florida Supreme Court has likewise spoken clearly: "[T]he disclosure of personal financial information may cause irreparable harm to a person forced to disclose it, in a case in which the information is not relevant." *Friedman v. Heart Inst. of Port St. Lucie,* 863 So.2d 189, 194 (Fla. 2003) (quoting *Straub v. Matte,* 805 So.2d 99, 100 (Fla. 4th DCA 2002)); *Elsner v. E-Commerce Coffee Club*, 126 So. 3d 1261, 1263 (Fla. 4th DCA 2013).

Normally, where privacy is involved, forced disclosure of information constitutes irreparable harm. *See Senior Executives Ass'n v. United States*, 891 F.Supp.2d 745, 755 (D. Md. 2012) ("the publication of plaintiff's financial information is a bell that one cannot unring.").

## B. Without the Injunction, President Trump Lacks an Adequate Remedy at Law

Because damage to a privacy interest is irreparable, President Trump also lacks an adequate remedy at law if the Court fails to enter the requested injunction. "Chilled free speech and invasions of privacy, because of their intangible nature, could not be compensated for by monetary damages; in other words, plaintiff could not be made whole." *Northeastern Florida Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).

It is a virtual certainty that if James obtains the Trust instrument the private details of President Trump's estate plan will end up widely published.

Once released, there would be no way to "unring the bell," and President Trump would be left without an adequate remedy at law to be made whole for the unlawful infringement of his right to privacy. Privacy, once lost, cannot be regained, and the damages to President Trump in his family relationships, associational rights, and privacy would be difficult to ascertain, at best.

## C. President Trump is Likely to Succeed on the Merits.

President Trump's claim is likely to succeed on the merits. The right to privacy is recognized under the United States Constitution, the State Constitution, and the common law.  The very specific private matter at issue here – the terms of President Trump's revocable trust, is clearly a matter which a reasonable person would expect to be able to keep private between himself and his estate planning lawyer. James' attempt to obtain this information speaks to her dogged campaign to harm President Trump in any way possible.  The burden is rightly on James to show that there is a compelling interest warranting the intrusion and that the intrusion is accomplished by the least intrusive means. *Daniel v Daniel,* 922 So.2d 1041 (Fla. 4th DCA 2006). This requires the "highest level of scrutiny." *Von Eiff,* 720 So.2d at 514.

Despite falsely asserting that the trust documents are "key documents" and "obviously relevant," James has no legitimate need for them for any purpose whatsoever, private or official. Such an instrument could scarcely be relevant to any civil or criminal proceeding during the lifetime of the settlor. In short, James

11

can offer no reason why she should not be restrained from trying to obtain these documents.

### D. Policy Considerations Entirely Favor Granting the Injunction

The public has a clear interest in maintaining individual privacy and preventing public officials from invading highly confidential estate planning documents for purposes of effecting personal or political embarrassment. Issuing a temporary injunction would serve the first public interest by enforcing the privacy rights held by the grantor of a living trust and preventing unlawful intrusion when there has been, and cannot be, a showing of relevance, compelling need, or minimal intrusion.

The second public interest is of deep significance. If James succeeds in obtaining this information, the chilling effect on all Americans who might seek public office would be significant.

### E. Only a nominal bond should be required as no harm will befall James for being restrained from access to private, confidential information belonging to President Trump

It is hard to imagine how James could claim to be harmed in any way from being restrained from obtaining access to information so private as the terms of President Trump's revocable trust, particularly where, as here, such an instrument could so rarely, if ever, be of any value to anyone else during the lifetime of the settlor (who possesses the absolute right to revoke same at any

time). A $500.00 bond should be required, sufficient to cover any appellate filing fee should James ultimately succeed in setting it aside.

## Conclusion

President Trump's Motion for Temporary Injunction should be granted.

WHEREFORE, Plaintiff, PRESIDENT DONALD J. TRUMP, respectfully requests that this Court:

    i.    enter an order enjoining Defendant, LETITIA JAMES, personally, or through any agents, servants, employees, attorneys, or all other persons in active concert or participation with her who receive notice of the injunction, from requesting, demanding, obtaining, possessing, or disclosing a copy of the 2020 and 2022 amendments to the Donald J. Trump Revocable Trust.

    ii.    and for such other and further relief as this Court deems appropriate under the circumstances.

Dated this 15th day of November, 2022.

WEBER, CRABB & WEIN, P.A.

*/s/ Timothy W. Weber*

Timothy W. Weber, Esq.
FBN: 86789
timothy.weber@webercrabb.com
lisa.willis@webercrabb.com
Jeremy D. Bailie, Esq.
FBN: 118558
jeremy.bailie@webercrabb.com

carol.sweeney@webercrabb.com
R. Quincy Bird, Esq.
FBN: 105746
quincy.bird@webercrabb.com
honey.rechtin@webercrabb.com
5453 Central Avenue
St. Petersburg, Florida 33710
(t): 727-828-9919
(f): 727-828-9924
*Attorneys for President Trump*