IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA
CIVIL DIVISION

PRESIDENT DONALD J. TRUMP,

     Plaintiff,

v.                                Case No.: 2022-CA-10792
                                       Division: AF

LETITIA JAMES, individually,

     Defendant.

_____/

**AMENDED COMPLAINT FOR DAMAGES,
DECLARATORY, AND INJUNCTIVE RELIEF**

     Plaintiff, PRESIDENT DONALD J. TRUMP ("President Trump"), by and through his undersigned counsel, sues Defendant, LETITIA JAMES ("James" or "Defendant"), and alleges:

**PRELIMINARY STATEMENT**

     1.     Extraordinary wrongdoing requires extraordinary relief. As set forth below, James has repeatedly abused her position as Attorney General for the State of New York to pursue a vendetta against President Trump, a resident of Palm Beach County, Florida, with the stated goal of destroying him personally, financially, and politically. Suffice it to say that these actions are contrary to both the Constitutions and the laws of New York and Florida and the United States Constitution.

2.     Defendant is an individual guided by personal and political animus and a desire to harass, intimidate, and retaliate against President Trump as a result of his engaging in the First Amendment protected activity of running for and serving as President of the United States, leading the Republican Party, and speaking out on matters of public concern in a manner with which James' happens to disagree.

3.     In furtherance of her persecution of President Trump using the trappings of her office, James has recently become occupied with obtaining a copy of President Trump's revocable trust, the Donald J. Trump Revocable Trust (the "Trust"), a revocable trust instrument governed by Florida law and sited in Florida. The operative Trust documents, executed in Florida with his Florida lawyer in 2020 and 2022, contain President Trump's private estate plan and decisions regarding the disposition of his assets. These are highly private matters between President Trump and his Florida estate-planning lawyer and enjoy constitutional and statutory protection.

4.     Defendant's actions also seek to infringe on the trustee's powers over the Trust and impose substantial interference with the ability of the trustee to discharge the trustee's duties in accordance with § 736.0815, Fla. Stat., § 736.0816 Fla. Stat., and the Trust.

5.     Perhaps most significantly, the true purpose of Defendant's dogged pursuit of President Trump is retaliatory. James simply cannot accept that

President Trump was elected and served as President, is the leading candidate for president in 2024, and speaks on matters in opposition to James' own views.

6.      President Trump's political views, beliefs, and affiliations, and those acts that he has taken in furtherance of his political career, are clearly established as recipients of the highest constitutional protection under the First Amendment to the United States Constitution.

7.      No person, no matter how prominent, should be singled out by state government officials for harassment, investigation, prosecution, or persecution solely for engaging in constitutionally protected activity. Defendant's conduct in doing so was and is intended to stifle President Trump's First Amendment activity, under color of law, because James disfavors the political ideologies, perspectives, opinions, and views held by President Trump and seeks to keep him from holding office again. Such conduct would clearly deter a person of ordinary firmness from engaging in further protected activity.

8.      President Trump comes before this Court for protection from James' efforts to invade his privacy and stifle his First Amendment activity.

9.      President Trump also seeks damages against James individually for the needless litigation costs and fees he has incurred defending himself, his family, and his business interests from Defendant's vexatious pursuit, compensatory damages up to $250,000,000 she is unlawfully attempting to

confiscate from him and his companies in furtherance of the unconstitutional scheme she has employed, and punitive damages.

10.    None of the actions taken by James against President Trump or his family, businesses, employees, or Trust would have been taken absent James' animus and unconstitutionally retaliatory motive. In fact, First Amendment retaliation had become the official policy of James and those she directed as of the first day she took office, long before disgraced former New York attorney Michal Cohen was induced to testify against President Trump (which James claimed to be the predicate of her investigation). The proceedings initiated against President Trump and many others were the carrying out of an unconstitutional policy previously established by James. The entire process was tainted by an unconstitutional design.

## JURISDICTION, PARTIES AND VENUE

11.    This is an action for damages, declaratory and injunctive relief.

12.    The Donald J. Trump Revocable Trust (the "Trust") is a Florida revocable trust established and governed by the laws of the State of Florida. Its principal place of administration is in Florida.  It is governed by documents created in 2020 and 2022 which remain in the possession of President Trump's private estate planning attorney. Plaintiff has the right to amend, modify, or revoke the Trust at any time.

13.     President Donald J. Trump is the settlor and a beneficiary of the Trust and resides in Palm Beach County, Florida.

14.     Circuit courts have original jurisdiction over all equitable claims pursuant to § 26.012(2)(c), Fla. Stat., as well as all actions at law where the amount in controversy is in excess of $30,000, exclusive of interest, costs and attorneys' fees.

15.     The Court has concurrent jurisdiction to consider claims under 42 U.S.C. § 1983 brought to vindicate the deprivation of "rights, privileges, or immunities secured by the Constitution."

16.     Pursuant to Florida Statutes, this Court may also act to protect and carry out the administration of a trust to the extent the Court's jurisdiction is invoked by an interested person or as provided by law. *See* § 736.0201(2), Fla. Stat.

17.     Venue for actions and proceedings concerning trusts, including those seeking a declaration of rights or other matters concerning trustees and beneficiaries under § 736.0201, may be laid in any county where the beneficiary suing or being sued resides. *See* § 736.0204, Fla. Stat.  In addition, venue against a non-resident may be laid in any county.

18.     This Court has personal jurisdiction over James, a non-resident, based on her unlawful attempts to reach into Florida and exercise powers delegated to the Trustee, as § 736.0202, Fla. Stat. provides, in relevant part:

> (a) Any trustee, trust beneficiary, **or other person, whether or not a citizen or resident of this state, who personally or through an agent** does any of the following acts related to a trust, **submits to the jurisdiction of the courts of this state involving that trust:**
>
> …
>
> (4) Accepts or **exercises a delegation of powers or duties from the trustee** of a trust having its principal place of administration in this state.

(emphasis supplied); s*ee Electro Eng'g Prods. Co. v. Lewis,* 352 So.2d 862, 864 (Fla.1977) (a plaintiff seeking to obtain jurisdiction over a nonresident defendant initially needs only to allege sufficient facts to make out a prima facie case of jurisdiction).

19.     This Court also has personal jurisdiction over James individually based on the tortious acts she committed both within and without this state that were directed at Plaintiff, a Florida resident, and his children, also Florida residents, and several of his Florida businesses.

20.     The tortious acts and scope of authority James seeks to exert over real property and other Trust assets also satisfy the minimum contacts requirements of due process. *See* § 48.193(1)(a)(2), Fla. Stat.; *Venetian Salami Co. v. Parthenais*, 554 So.2d 499, 502 (Fla. 1989) (establishing a two-step inquiry for determining whether long-arm jurisdiction over a non-resident in a given case is proper: (i) facts satisfying the long-arm statute, and (ii) minimum contacts to satisfy due process requirements).

21.     As to the first step of the *Venetian Salami* inquiry, President Trump's claim under 42 U.S.C. § 1983 alleges an intentional tort by Defendant. *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709, 119 S. Ct. 1624, 1638, 143 L. Ed. 2d 882 (1999) (holding "there can be no doubt that claims brought pursuant to § 1983 sound in tort"). And while mere economic injury is insufficient to confer personal jurisdiction without accompanying personal injury, the U.S. Supreme Court has found that the alleged harm suffered by a § 1983 plaintiff is best characterized as a personal injury. *Wilson v. Garcia*, 471 U.S. 261, 278 (1985) (characterizing § 1983 actions as involving claims for personal injuries). This satisfies § 48.193(1)(a)(2), Fla. Stat.

22.     As to the second step, President Trump returned to his Palm Beach County residence in January 2021, and Defendant, acting under the color of law, has continuously published content viewed in Florida, issued subpoenas and summonses directed to President Trump and other Florida residents, and generally pursued him, his business interests in Florida, and his Florida revocable trust in an attempt to stifle the exercise of his constitutional rights in Florida. This conduct satisfies the minimum contacts requirement.

23.     Unless judicial relief is provided as described herein, President Trump will be irreparably deprived of speech, privacy, and other rights by James.

24.     All conditions precedent to the maintenance of the causes of action alleged herein, if any, have occurred or been performed, excused, or waived.

## GENERAL ALLEGATIONS

**I.**     **Defendant's Longstanding Animosity Toward President Trump**

25.     Prior to serving as Attorney General of the State of New York, Defendant served as a Democratic member of the New York City Council and New York City Public Advocate for over a decade.

26.     After President Trump's victory in the 2016 Presidential Election, Defendant began displaying severe animosity towards then President-elect Trump.

27.     Even before President Trump's inauguration, Defendant retweeted calls for sit-ins to protest President Trump's nomination of Jeff Sessions to be United States Attorney General.

28.     Five days after President Trump's inauguration, Defendant joined public protests and declared that his "administration ha[d] shown its true and ugly colors, but we will not be silent."

29.     Over the next several months, Defendant continued to publicly voice her disdain for President Trump and his administration.[1]

---

[1] *See, e.g.*, *id.*, (Feb. 11, 2017, 12:01 PM ET) https://bit.ly/3IiyZpK ("@villagedemocrat out in full force today calling on our elected officials to fight for us against this administration."); *id.*, (Mar. 5, 2017, 5:01 PM ET) https://bit.ly/2Gl6c56 ("Hey @realDonaldTrump, we're in Queens, your hometown, rising up against your xenophobic policies, & we're ready to act."); *id.*, (June 3,

30.     Six and a half months into President Trump's term, Defendant was already leading "die-in" protests against President Trump because, according to her, "we are all being killed by this administration."[2] Defendant punctuated her tweet with the hashtag, "Resist."

31.     The hashtag "#Resist" is recognized as shorthand for fighting President Trump at every level in an effort to make President Trump and his supporters "uncomfortable and not able to rest well" and thus unable to effectively implement policy.[3]

32.     Defendant's embrace of the "resistance" mentality from the earliest days of the Trump presidency foreshadowed her relentless abuse of power as Attorney General.

33.     Roughly ten months into President Trump's term, Defendant announced: "I've been leading the resistance against Donald Trump in NYC and will only continue to do so in every way possible."[4]

34.     In her capacity as New York City Public Advocate, Defendant demonstrated a willingness to wield the government's power against those

---

2017, 10:18 AM ET) https://bit.ly/33z0XYj ("Always proud to be with strong New York women standing up & speaking out against an administration that doesn't represent out values.").

[2] *id*. (Aug. 14, 2017, 5:55 PM ET) https://bit.ly/3lu9fqz .

[3] *'Resist' is a Battlecry, But What Does It Mean?* The New York Times, Feb. 14, 2017, https://nyti.ms/2GLln77 .

[4] *Id*., (Oct. 16, 2017, 7:57 PM ET) https://bit.ly/3d4wBQr emphasis added).do so in every way possible." Id., (Oct. 16, 2017, 7:57 PM ET) https://bit.ly/3d4wBQr (emphasis added).

whose political beliefs differed from her own.[5] That willingness took center stage in Defendant's political campaign for attorney general and her subsequent actions as New York's chief law enforcement officer.

## II. Defendant Campaigned for Attorney General on a Promise to Target President Trump and the Trump Organization

35.    In May of 2018, Defendant declared her candidacy for Attorney General of the State of New York.

36.    As a candidate for Attorney General, Defendant made "taking on Donald Trump"[6] the focal point of her campaign, often comparing herself to Special Prosecutor Robert Mueller, who, at the time, was leading the investigation into the now-debunked allegations that the Trump campaign colluded with Russians to interfere in the 2016 presidential election.

37.    Defendant's campaign website not only repeated derogatory and inaccurate statements concerning President Trump's policies but also stated— with no evidentiary basis whatsoever— that President Trump had engaged in "public corruption."[7]

---

[5] *See id.*, (July 19, 2017, 10:32 AM ET) https://bit.ly/2F3wHLt ("We will not allow companies that build Trump's wall, a monument to racism and bigotry, to also do business with NYC.")

[6] See, e.g., Letitia James (@TishJames), Twitter (June 27, 2018, 10:48 AM ET) https://bit.ly/2GG4uuy ("Congrats [now-Congresswoman Alexandria Ocasio Cortez] on your victory. Looking forward to working with you to help Democrats take on Donald Trump.")

[7] http://www.tishjames2018.com/corruption/

38.     Though it appears to have since been removed, the website at one time provided a link to a detailed outline of Defendant's strategy for rooting out corruption, with a section specifically devoted to attacking President Trump, his family, and the Trump Organization entitled "*Investigate Trump's New York Business.*"

39.     As stated in the outline, the investigation would include:

> a review of Trump-related real estate transactions, especially those in which the Trump family suddenly started paying cash for properties after years of operating their businesses exclusively by borrowing money.

40.     Defendant had no personal knowledge about any "Trump-related real estate transactions" at the time that she made these statements and possessed no information or insight into President Trump's financing arrangements other than what she had presumably seen in the media.

41.     Nonetheless, Defendant continued to shamelessly campaign on her unfounded allegations against President Trump and his family in a misguided effort to garner media attention and promote her fundraising efforts.

42.     On June 26, 2018, Defendant spoke at a protest opposing the Supreme Court's decision in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), telling the crowd that "it's critically important that we all understand that this was a

result of the fact that [Republicans] stole the Supreme Court seat. An illegitimate president and an illegitimate member of the Supreme Court."[8]

43.    On July 1, 2018, Defendant tweeted "New Yorkers need a fighter who will take on Donald Trump … I'll be that fighter. Join my campaign."[9]

44.    On July 19, 2018, in the midst of a politically-charged speech before The Bronx Democratic Party, Defendant promised to use the law as a "sword" to relentlessly bombard President Trump, proclaiming that "no one is above the law, including this illegitimate president…and so *I look forward to going into the office of Attorney General every day, suing him, defending your rights, and then going home!*"[10]

45.    In what can only be construed as an attempt to threaten and intimidate President Trump, Defendant then tweeted that President Trump is "running out of time" and warned him that she would immediately investigate him and his "cronies" when she took office.

46.    Defendant issued a similar threat on August 22, 2018, when she said, among other things, that President Trump "should be scared" about her upcoming term.

---

[8] *Letitia James Foley Sq Opposing Travel Ban Supreme Court Decision*, YouTube, 0:55 (June 26, 2018) https://bit.ly/3d58PDS.

[9] Letitia James (@TishJames), Twitter (July 1, 2018, 2:56 PM ET) https://bit.ly/3nh8rH4

[10]    Letitia    James,    Facebook,    1:18    (July    19,    2018)    (emphasis    added), https://m.facebook.com/LetitiaJamesforNY/videos/ 203059860348974.

47.     On September 10, 2018, Defendant vowed to "stand up" to Trump, and later that evening, Defendant declared once more that she was "just getting started" in "tak[ing] on" President Trump.

48.     Of course, even when addressing President Trump's role as the sitting President of the United States, James was driven by deep animosity for him personally and an obsessive denial that he had the right to hold public office.   In a troubling September 12, 2018 video, released during the Democratic primary, Defendant pledged that she would "never be afraid to challenge this illegitimate president."

49.     In the very same video, Defendant baselessly accused President Trump of a slew of crimes, including obstruction of justice and laundering money from foreign governments, and demanded that he be indicted. Defendant promised to "join with law enforcement and other attorney generals across this nation *in removing this President from office*." Mirroring her previous allegations, Defendant's call for President Trump to be investigated was devoid of both fact and merit. Nevertheless, Defendant concluded the video by promising that "the days of Donald Trump are coming to an end."

50.     On the same day, Defendant took to Twitter to double down, reiterating her warrantless claim that President Trump is an "illegitimate president" and promising once more to "fight back" against Trump if New Yorkers voted for her.

### III.    As Attorney General, Defendant Immediately Implemented her Premeditated, Ongoing Plan of Intimidation and Harassment of President Trump

51.    On November 6, 2018, Defendant was elected, as a Democrat, the Attorney General of the State of New York and immediately began implementing her plan to weaponize her office to attack President Trump in a manner exceeding conventional political opposition. During her victory speech, she made a solemn promise to "shin[e] a bright light into every dark corner of [Trump's] real estate holdings," making no distinction between holdings located in New York and those located elsewhere, including Florida.

52.    Emboldened by her election, Defendant began to shamelessly display the bias against President Trump that she demonstrated before gaining office, publicly guaranteeing the outcome of any future investigation or claim against President Trump. These guarantees were made before she had ever established even a pretext of legal predicate for an investigation, claim, or action, and before gathering any facts or requesting documents from President Trump in connection with an investigation, claim, or action.

53.    In a stark example, in an interview with political activist and former Democratic candidate for New York City Council Adina Sash, Defendant was asked if she planned to "sue [President Trump and the Trump Organization]." Defendant laughingly responded "[o]h, we're definitely going

to sue him.  We're going to be a real pain in the ass.   He's going to know my name personally."

54.    Then, on December 12, 2018, during an NBC News interview given eighteen days before assuming office, Defendant vowed to "use every area of the law to investigate President Trump and his businesses transactions and that of his family as well."  Notably, Defendant did not curtail her persecution of Trump and his family, instead promising to also investigate "anyone in [President Trump's] orbit."

55.    Defendant repeatedly, publicly, and proudly stated during her campaign and transition period that she intended to weaponize her office to target and intimidate President Trump upon taking office. This ensured her policy of intimidation would be in place on day one.

56.    In fact, Defendant's open threats and promises to investigate and sue President Trump were so appalling that even members of her party condemned them as unlawful.

57.    For instance, Daniel Goldman, the Democratic Party's counsel for the impeachment process against President Trump and a former Assistant United States Attorney in Manhattan, warned that Defendant's statements "give the appearance of an individualized political vendetta . . . It's essential that prosecutors maintain their neutrality and an objective view of the fact evidence, no matter the politics involved."  By abandoning even the pretext of

such neutrality, Goldman stated Defendant "[went] too far in allowing politics to shape her agenda."

58.    In sum, before assuming office, Defendant promised to investigate President Trump dozens of times over many months, before obtaining *any* information specific to her eventual public office that could supply an authentic predicate to an unbiased investigation or action against President Trump. Her campaign promises and transition plans to investigate President Trump's business activities and associates were based on information no greater than that available to any other citizen and establish that the Defendant brought a premeditated policy of intimidation and harassment to her role as Attorney General.

59.    Defendant was sworn in as Attorney General of New York on January 1, 2019.  In so doing, Defendant swore to support the Constitution of the United States and faithfully discharge the duties of Attorney General. Unfortunately, she must have had her fingers crossed behind her back when she did so.

60.    Upon assuming her role, Defendant immediately went to work making good on her campaign promises and established her premeditated policy of intimidation and harassment of President Trump as the policy of her office.

61.     From that point forward, Defendant's actions assumed the color of law, although irredeemably tainted by Defendant's pre-established policy of intimidation and harassment.

## IV.     Defendant's Policy of Intimidation and Harassment Leads to the Special Proceeding

62.     On January 3, 2019, three days after she was sworn in as Attorney General, Defendant told CNN that she would "ensure that the man currently occupying the Oval Office is held accountable to [sic] any and everything he has done."

63.     Defendant further stated that she would "never be afraid to challenge this illegitimate president" and that investigating Trump "fuels [her] soul."

64.     On March 11, 2019, Defendant employed the authority and vast array of resources of the Office of the Attorney General to formally open an investigation of the Trump Organization and issued subpoenas to Deutsche Bank and Investors Bank "for records relating to the financing of four major Trump Organization projects."

65.     The subpoenas were "a culmination of months of threats from [Defendant] that she would aggressively investigate Mr. Trump."

66.     Defendant later claimed as grounds for initiating the investigation of President Trump that she relied upon February 19, 2019 testimony given by

Michael Cohen ("Cohen"), a discredited, disgraced, and disgruntled[11] former attorney of President Trump who evaded taxes on income from his taxicab medallions, made false statements to financial institutions for personal gain, and lied to Congress.

67.    Defendant's claim of reliance on Cohen's testimony was pretext, not predicate. Defendant had established as policy the retaliation against President Trump and publicly announced her intent to initiate investigations in search of a crime years before Cohen testified before Congress.

68.    Moreover, Defendant used her six weeks in office before Cohen's testimony to establish an official policy of intimidating and harassing President Trump.

69.    Defendant openly flouted her duty to remain neutral in public commentary pertaining to an ongoing investigation. Defendant continued to disparage President Trump and the Trump Organization throughout 2019, even floating outright lies.

70.    For example, on April 23, 2019, Defendant repeated her prior, unfounded allegation that President Trump and the Trump Organization were engaged in criminal activity: "We need to focus on Donald Trump and his

---

[11] Mr. Cohen's most recent lawsuit against President Trump was dismissed the day before this filing. *See Cohen v. United States of America*, et al., 21-CV-10774 (S.D. NY November 14, 2022) (Liman, J.).

abuses . . . we need to follow his money . . . we need to find out where he's laundered money . . . ."

71.    Defendant fabricated these allegations out of thin air, indicating that even after assuming her office and initiating investigations her desire to pursue President Trump was driven by bias, political animus, and the most severe case of Trump Derangement Syndrome.

72.    With this mindset firmly established, even after the Cohen testimony, it is clear any stated predicate for initiating an investigation was merely a pretext for achieving her overall goal of intimidating and harassing President Trump and the Trump Organization to garner undeserved publicity for herself as a politician and harm President Trump and "anyone in his orbit."

73.    Defendant's conduct continued. On July 23, 2019, Defendant tweeted that Trump "has spent his career hiding behind lawsuits" and promised to "vigorously fight" him.

74.    Two and a half weeks later, Defendant served a subpoena *duces tecum* on President Trump, the Trump Organization's corporate officers, President Trump's children, and third parties for information and testimony about a wide range of properties across the country, specifically including many in Florida.

75.    On August 24, 2020, Defendant commenced a special proceeding under Article 4 of the New York Civil Practice Law and Rules, in New York

Supreme Court, New York County, ostensibly to compel compliance with the subpoenas previously issued. *See People v. The Trump Organization*, No. 451685/2020 (the "Special Proceeding").

76.   Under Defendant's leadership the Office of the Attorney General has been reduced to nothing more than a weapon in James' arsenal to wage war on President Trump.  This is made abundantly clear by the fact that August 24, 2020 was also, conveniently, the first day of the Republican National Convention.  Clearly, Defendant's true goal was the ongoing intimidation and harassment of President Trump with the intent of causing him harm.

77.   As a result of the subpoenas, President Trump and his companies produced over 8 million pages of documents. Still, James was not satisfied.

**V.   Defendant's Policy of Pursuing President Trump Accelerated Post-Presidency.**

78.   President Trump left office on January 20, 2021, but as a private citizen he has remained in the public eye and remains widely viewed as the leader of the Republican Party. Since leaving office, he has publicly promoted policies and candidates he favors while opposing the disastrous policies of the Biden Administration and other Democrats, which he believes have so badly hurt our nation.

79.     Defendant, emboldened by the November 2020 elections, hoped for a personal political lift by associating her Office's unjust pursuit of President Trump and the Trump Organization with his departure from office.

80.     Defendant declared her candidacy for Governor of New York State on October 29, 2021.

81.     In her announcement video, she boasted that she "sued the Trump Administration 76 times, but who is counting?"  In making this statement, Defendant signaled that she had planned to make "taking on Trump" the centerpiece of yet another statewide campaign.

82.     On December 9, 2021, amid poor polling numbers, Defendant suspended her campaign for Governor of New York.  The reason behind the lack of support for her gubernatorial candidacy remains unclear, but aside from her dogged pursuit of President Trump, Defendant's record as Attorney General has little to show. Perhaps the public had reservations over electing as their governor a Javert-style persecutor driven by personal vendettas against political opponents. Perhaps some voters were tired of her commitment to a political witch hunt given the statewide crime rate or considered her unqualified or unlikable.

83.     In any event, at her withdrawal from the gubernatorial race Defendant stated, "I have come to the conclusion that I must continue my work as attorney general.  There are a number of important investigations and cases

that are underway, and I intend to finish the job. I am running for reelection to complete the work New Yorkers elected me to do."

84. By saying this, Defendant left no doubt that she remained undeterred from her relentless pursuit of her investigation of "all things Trump" and would use it in her run for reelection.

85. Unlike the campaign promises of her first run, however, Defendant's reelection strategy would need to be fueled by action. This required her to move beyond the investigation that drove the Special Proceeding and toward a civil action.

## VI. Defendant Initiates a Civil Enforcement Action Against President Trump Pursuant to her Policy of Intimidation and Harassment

86. On September 21, 2022, Defendant commenced a civil action in the Supreme Court of the State of New York, New York County, *entitled People of the State of New York, et al. v. Donald J. Trump*, et al, Index No. 452564/2022 (the "Civil Action") by directing a subordinate, consistent with Defendant's established policy of intimidation and harassment of President Trump and "anyone in his orbit", to file a complaint pursuant to the authority granted to the Office of the Attorney General of the State of New York under Executive Law § 63(12) ("E.L. 63(12)"). That same day, Defendant held a press conference publicly announcing that President Trump and his children had committed violations of federal criminal law and that she was *publicly* referring them to

22

the United States Attorney for the Southern District of New York and the Internal Revenue Service. These statements were intended to harm these Florida residents and further chill their expressive activity.

87. Defendant next directed a subordinate, consistent with her policy of intimidation and harassment of President Trump, to seek a preliminary injunction to restrain and supervise (i.e., destroy) his companies.

88. James seeks to extend oversight and control to President Trump's Florida revocable trust, threatening to substantially interfere with the ability of the trustee of the Trust to carry out its provisions and discharge his duties in accordance with Florida law.

89. Similar to how Defendant timed her initiation of the Special Proceeding to maximize her own political benefit and damage President Trump, Defendant's request for preliminary judicial intervention in the Civil Action was designed to create a media sensation that would damage President Trump and raise her own political profile days before the national midterm elections and her own bid for reelection

90. In context, Defendant's efforts to obtain control over President Trump's business organization, including the Trust, is the culmination of her endless public promises to investigate President Trump and anyone in his circle. It follows her frequent public disparagement of President Trump, her accusations of criminal conduct, her aggressive and wide-sweeping

investigation into President Trump's business activities that led to and included the Special Proceeding, and now the initiation and prosecution of the Civil Action and more inter-agency referrals for more investigations and more prosecutions.

91.   On October 31, 2022, James filed additional documents revealing her zeal to obtain a copy of President Trump's Florida-based revocable trust. A copy of this correspondence is attached as **Exhibit A.**[12]

92.   President Trump, a Florida resident with the right to revoke, amend, or modify the terms of his revocable trust at any time before it becomes irrevocable, requires protection from James' demand to invade his privacy.

93.   After becoming aware of this action for an injunction to restrain her from obtaining the revocable trust document, James immediately attempted to get it. On November 3, 2022, the day after this suit was filed, James, through a subordinate, filed a letter (the "November 3 Letter") in the Civil Action addressed to the New York Judge complaining about the instant lawsuit. A copy of this correspondence is attached as **Exhibit B.**[13]

---

[12] The Court may and should take judicial notice of **Exhibit A,** a true and correct copy of "*Faherty Reply Affirmation Exhibit E*," filed by Defendant's office as NYSCEF Doc. No. 164 in the Civil Action. See *Dufour v. State*, 69 So. 3d 235, 253 (Fla. 2011), *as revised on denial of reh'g* (Aug. 25, 2011) (quoting § 90.202 Fla. Stat. and finding the statute permits a court to take judicial notice of various matters including "[r]ecords of any court of this state or of any court of record of the United States or of any state, territory, or jurisdiction of the United States.")

[13] The Court may take judicial notice of **Exhibit B,** a true and correct copy of the "November 3 Letter," filed by Defendant's office as NYSCEF Doc. No. 182 in the Civil Action. See *Dufour*, 69 So. 3d at 253.

94.     Defendant baselessly asserted in the November 3 Letter that the revocable trust and all amendments to it were "key documents" that are "obviously relevant" to the Civil Action. These statements were knowingly false as a person's intended disposition of their assets could never be relevant in a legal proceeding during their lifetime, something any trained lawyer, and certainly a State Attorney General, should appreciate.

95.     The November 3 Letter also claimed that by initiating this action President Trump was attempting to "put assets beyond the reach" of the State of New York. Again, James' claims were knowingly false and outrageous since James sued the corporate entities ultimately owned by the revocable trust that in turn contain the assets, including immovable real estate in New York City worth multiples of what James was seeking in the Civil Action lawsuit. Due to her many pretexts for invading President Trump's private dealings, and numerous false allegations, this action was initiated to protect President Trump from James, a stalker with a law license and government position. James' conduct violates President's Trump's right to privacy in the Trust, which is protected by the Fourteenth Amendment of the United States Constitution, the Florida Constitution, and the common law.

96.     Zooming out, it becomes clear that the Civil Action and the Defendant's efforts to secure and oversee the Trust are just the most recent salvo in Defendant's broader battle of discrimination and retaliation against

25

President Trump for exercising his constitutionally protected rights to free speech and free association, which conduct is ongoing and threatens to continue given James' recent reelection.

97.     Absent judicial relief, including the permanent and temporary injunctive relief sought, James will continue her campaign to obtain the revocable trust instrument, interfere in the administration of the revocable trust, interfere with President Trump's right to revoke the revocable trust, and irreparably harm President Trump and assets he controls in the State of Florida which employ nearly a thousand employees in the State.

## COUNT I

**(42 U.S.C. § 1983) – Freedom of Speech and Association, Privacy, Due Process, Equal Protection, Privileges & Immunities**

98.     Plaintiffs re-assert and re-allege the allegations contained within paragraphs 1 through 97 as if fully set forth herein.

99.     Defendant's conduct, described above, has variously violated President Trump's rights protected by the First and Fourteenth Amendments of the United States Constitution.

100.   The First Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, guarantees, *inter alia*, the rights to freedom of speech and freedom of association.  U.S. Const. Amend. I.; *see, e.g.,*

*NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *Bates v. City of Little Rock*, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960).

101.   The United States Supreme Court has clearly established that political speech is the most protected form of speech under the First Amendment.

102.   Freedom of association is also protected by the First Amendment.

103.   President Trump, the Forty-Fifth President of the United States, is a prominent political figure and considered by many to be the head of the Republican Party.

104.   President Trump's political views, beliefs, and affiliations, and those acts he has taken in furtherance of his political career, are a form of political speech subject to the highest constitutional protection under the First Amendment.

105.   The right to freedom of association grows out of the First Amendment's guarantees of the rights to peaceable assembly and freedom of speech. The associational privilege exists "for the purpose of advancing ideas and airing grievances" and is indisputably protected against state actors by the Due Process Clause of the Fourteenth Amendment. *Eccles v. Nelson*, 919 So. 2d 658, 661 (Fla. 5th DCA 2006) (citing *Bates*, 361 U.S. 516).

106.   The associational privilege also "protects against compelled disclosure that would adversely affect an organization by 'induc[ing] members

to withdraw ... and dissuading others from joining because of fear of exposure.'" *Fla. State Conf. of Branches & Youth Units of NAACP v. Lee*, 568 F. Supp. 3d 1301, 1307 (S.D. Fla. 2021) (citing *NAACP*, 357 U.S. at 463).

107.   Here, Defendant's repeated and unapologetic desire to retaliate against President Trump and "anyone in his orbit," through any means available to her, present an affront to the United States' Constitution's guarantee of President Trump's speech and associational rights.

108.   Defendant's actions violate, among other things, President Trump's rights to substantive due process, speech, association, equal protection of the law, and the privileges and immunities protected by the Fourteenth Amendment.

109.   Defendant's conduct also violates President Trump's right to privacy secured by the Fourteenth Amendment to the United States Constitution.

110.   The right to privacy is deeply rooted in this nation's history and tradition and is a clearly established component of the Due Process Clause of the Fourteenth Amendment. *See Griswold v. Connecticut*, 381 U.S. 479 (1965); *Dobbs v. Jackson Women's Health Org.*, 213 L. Ed. 2d 545,  142 S.Ct. 2228 (2022).

111.   The right to privacy involves both the individual interest in (i) avoiding disclosure of personal matters, and (ii) the interest in independence

in making certain kinds of important decisions. *Whalen v. Roe*, 429 U.S. 589, 598–600 (1977) (collecting cases).

112.   As part of her unconstitutional scheme, Defendant seeks access to the trust instrument of the Donald J. Trump Revocable Trust. President Trump has a legitimate expectation of privacy in the Trust instrument and Defendant has not, and cannot, advance a legitimate, compelling state interest in obtaining the Trust instrument. Moreover, based upon past conduct of James, it is reasonable to conclude that James would widely publish the instrument once obtained.

113.   Defendant's conduct in commencing and continuing the Civil Action, making numerous referrals to other agencies about President Trump and his family members, and other conduct is intended to stifle his free speech, isolate him from current and future associates, and expose his private information needlessly.

114.   Defendant has harmed President Trump's rights to free speech, free association, and privacy in both a discriminatory and retaliatory manner.

115.   At all relevant times, Defendant was acting under the pretense and color of the law.

116.   Plaintiffs' First Amendment and Fourteenth Amendment rights have been, and continue to be, wrongfully infringed upon by way of James' unlawful abuse of her authority and deployment of state power to discriminate

against, retaliate against and otherwise suppress the rights of free speech belonging to President Trump.

117.   As a direct and proximate result of Defendant's conduct, President Trump has suffered, and will continue to suffer, significant, imminent and irreparable harm in the form of deprivation of his constitutionally protected rights, privileges, and immunities afforded under the First Amendment and the Fourteenth Amendment, as secured by 42 U.S.C. § 1983.

118.   In addition to the declaratory and injunctive relief sought herein, President Trump is also entitled to an award of attorneys' fees, costs, and disbursements pursuant to 42 U.S.C. § 1988.

119.   While the full harm to President Trump's clearly established constitutional rights is irreparable, Defendant's overarching plan to vex everyone in President Trump's circle has had pecuniary effect on President Trump's businesses, business relationships, and brand value. The Civil Action alone seeks to confiscate $250,000,000 from President Trump, which action would not have occurred but for James' unconstitutional scheme.

120.   President Trump has thus been damaged by Defendant's unlawful conduct at trial but includes: (1) potentially as high as $250,000,000 in confiscation from the civil action; (2) legal fees and costs incurred in defending against the campaign of retaliation; (3) and other damages in an amount to be proven at trial.

121.   The conduct of James was malicious, done with evil intent, and in callous disregard of President Trump's federally protected rights.

WHEREFORE President Trump demands declaratory and injunctive relief, compensatory and punitive damages, attorneys' fees, costs, and such other and further relief as the Court deems proper.

## COUNT II

**(Violation of Plaintiff President Donald J. Trump's
Rights to Privacy and Property Protected by Florida Law)**

122.   Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1-97 above as if fully set forth herein.

123.   President Trump is a natural person residing in Florida with the right to be left alone from governmental intrusion into his private life under Article I, Section 23 of the Florida Constitution. He also enjoys substantial common law privacy protections from private actors who would tortiously invade his privacy.

124.   A right to privacy is a personal one, and intentional damage to an individual's rights to privacy is personal injury and tortious.

125.   The constitutional right of privacy ensures that individuals are able to determine for themselves when, how, and to what extent information about them is communicated to others. *Weaver v. Myers*, 229 So.3d 1118 (Fla. 2017).

126.   The right to privacy recognized by the Florida Constitution encompasses at least two different categories of interest; the first is the individual interest in avoiding disclosure of personal matters, while the second is the interest in independence in making certain kinds of important decisions. *G.P. v. State,*, 842 So.2d 1059 (Fla. 4th DCA 2003).

127.   Florida's constitutional privacy provision protects citizens from government's uninvited observation of or interference in those areas that fall within ambit of zone of privacy afforded under provision.   *City of North Miami v. Kurtz*, 653 So.2d 1025 (Fla. 1995), *rehear'g denied, cert. denied* 116 S.Ct. 701, 516 U.S. 1043, 133 L.Ed.2d 658.

128.   President Trump's right to privacy is a fundamental right that requires evaluation under a compelling state interest standard; however, before the right to privacy attaches and the standard is applied, a reasonable expectation of privacy must exist.   *A.H. v. State*, 949 So.2d 234 (Fla. 1st DCA 2007), *rev. denied* 959 So.2d 715.

129.   President Trump has a reasonable expectation of privacy regarding the contents of his estate planning documents and the terms of his revocable trust.

130.   President Trump's expectation of privacy was based on his authentic, subjective expectations as an individual and align with societal values, particularly those interested in deterring a public official from gaining

access to private estate planning information as part of a witch hunt against a political opponent done under the color of law.

131.   In fact, the right to privacy guaranteed by the Florida Constitution protects the disclosure of financial information of private persons if there is no relevant or compelling reason to require disclosure because personal finances are among those private matters kept secret by most people. *McFall v. Welsh*, 301 So.3d 320 (Fla. 5th DCA 2019).

132.   Florida's fundamental right to privacy guaranteed by the Florida Constitution provides an individual protection "from intrusion or coercion, whether by government or by society at large." *Green v. Alachua Cnty.*, 323 So. 3d 246 (Fla. 1st DCA 2021). It thus provides a guide for courts to evaluate invasions of privacy by private persons, particularly those individuals, like Defendant, who act under the color of law.

133.   The right to privacy includes information contained in Florida trusts. *Inglis v. Casselberry,* 200 So.3d 206 (Fla. 2d DCA 2016); *see also Compton v. W. Volusia Hosp. Auth.*, 727 So. 2d 379, 382 (Fla. 5th DCA 1999).

134.   An individual's private financial information and trust documents are entitled to protection by state constitutional right of privacy if there is no relevant or compelling reason to compel disclosure, which normally must be made at an evidentiary hearing. *See id.; see also  Mogul v. Mogul,* 730 So.2d 1287 (Fla. 5th DCA 1999).

135.    Defendant cannot demonstrate any legitimate interest let alone a compelling one for interfering with President Trump's right to privacy as her true interest lies in her personal vendetta against President Trump that she has relentlessly pursued both before and after gaining office.

136.    Absent an injunction from a Florida court protecting the privacy of a Florida resident from unlawfully prying nonresidents, James may gain access to the Trust instrument and further violate President Trump's right to privacy without ever needing to present a justification of any kind.

137.    If James' past conduct is any indication, James will also publicly disclose this information once obtained.  She has maliciously vowed to shine a light in every corner of President Trump's life.

138.    Privacy, once lost, cannot be regained. The harm is irreparable and palpable.

139.    Similarly, Defendant's conduct threatens to violate President Trump's property rights, which are protected by Article I, Section 2 of the Florida Constitution.

140.    Under Art. I, Sec. 2 of the Florida Constitution, "All natural persons are equal before the law and have inalienable rights, among which are the right to enjoy and defend life and liberty, to pursue happiness, to be rewarded for industry, and to acquire, possess and protect property; except that the ownership, inheritance, disposition and possession of real property by

aliens ineligible for citizenship may be regulated or prohibited by law." Fla. Const. Art I, Sec. 2; *see also Shriners Hosps. for Crippled Children v. Zrillic*, 563 So. 2d 64, 66–67 (Fla. 1990).

141.   The constitutional right to property "includes the incidents of property ownership: the collection of rights to use and enjoy property, *including [the] right to transmit it to others.*" *Id.* at 67 (emphasis in original, internal quotations omitted). Simply put, "the right to devise property is a property right protected by the Florida Constitution"). *Id.*

142.   Defendant has intentionally violated the rights of President Trump and will continue to do so unless this Court intervenes.

WHEREFORE President Trump demands preliminary and permanent injunctive relief restraining James, her agents, servants, employees, and attorneys and all other persons in active concert or participation with her who receive actual notice of the injunction, from requesting, demanding, obtaining, possessing, or disclosing a copy of his revocable trust or the terms thereof, or of restraining Plaintiff's ability to amend, modify or revoke the Trust, and such other and further relief as the Court deems proper, including costs.

## COUNT III

**(Violation of Plaintiff President Donald J. Trump's Rights As Grantor and Beneficiary of the Donald J. Trump Revocable Trust)**

143.   President Trump re-alleges and incorporates by reference the allegations in paragraphs 1-97 above as if fully set forth herein.

144.   President Trump is both the settlor and a beneficiary of the Donald J. Trump Revocable Trust.

145.   As such, President Trump holds the power of designating the trustee of the Trust under both the express terms of the Trust and under the Florida Trust Code.

146.   President Trump also retains the right to amend, modify, or revoke the Trust.

147.   Defendant's conduct threatens to interfere with his lawfully protected right to the proper administration of the Trust by supplanting, controlling or monitoring the trustee and attempting to exercise or restrain the exercise of powers delegated by President Trump to the trustee or belonging to him alone.

148.   President Trump requires a declaration concerning the rights of his trustee to control the Trust free from interference by James.

149.   President Trump seeks injunctive relief to prevent Defendant's future attempts to unlawfully supplant the trustee or exercise powers held by the trustee in any manner, either personally or through an agent.

WHEREFORE President Trump demands preliminary and permanent injunctive relief restraining James, her agents, servants, employees, and

attorneys and all other persons in active concert or participation with her who receive actual notice of the injunction, (i) from requesting, demanding, obtaining, possessing, or disclosing a copy of his revocable trust or the terms thereof, (ii) from exercising any authority or oversight or restraint on his revocable trust or ability to revoke it, as well as declaratory relief that James has no authority to supplant or control the powers of the trustee of such a trust, and (iii) and such other and further relief as the Court deems proper, including costs.

Dated this 15th day of November, 2022.

**WEBER, CRABB & WEIN, P.A.**

*/s/ Timothy W. Weber*
Timothy W. Weber, Esq.
FBN: 86789
timothy.weber@webercrabb.com
lisa.willis@webercrabb.com
Jeremy D. Bailie, Esq.
FBN: 118558
jeremy.bailie@webercrabb.com
carol.sweeney@webercrabb.com
R. Quincy Bird, Esq.
FBN: 105746
Quincy.Bird@webercrabb.com
honey.rechtin@webercrabb.com
5453 Central Avenue
St. Petersburg, Florida 33710
(t): 727-828-9919
(f): 727-828-9924
*Attorneys for President Trump*